**In re KITTYHAWK TELEVISION CORP., Bankrupt.**

**Robert K. CORWIN, Trustee, Plaintiff-Appellee,**

**v.**

**RCA CORPORATION, Defendant-Appellant.**

**No. 74–2155.**

United States Court of Appeals, Sixth Circuit.

May 8, 1975.

Nicholas C. Hollenkamp, Turner, Granzow, Spayd & Hollenkamp, Dayton, Ohio, for defendant-appellant.

Frank M. Root, Jr., Jack F. Pickrel, Dayton, Ohio, for plaintiff-appellee.

Before WEICK, MILLER and ENGEL, Circuit Judges.

WILLIAM E. MILLER, Circuit Judge.

This action originated in the bankruptcy court as a contest between the trustee in bankruptcy of Kittyhawk Television Corporation (Television) and a creditor of the bankrupt, Radio Corporation of America (RCA), claiming a security interest in equipment of the bankrupt.

On the basis of a stipulated record, the bankruptcy judge found that RCA's security interest in the equipment it had sold to Television had not been properly perfected and thus was not enforceable against the trustee. The district court affirmed the bankruptcy judge, and this appeal was filed by RCA.

The stipulated facts may be summarized as follows: On February 3, 1965, Kittyhawk Broadcasting Corporation (Broadcasting) was incorporated under the laws of Ohio for the purpose of operating a television station. In November 1966 and February 1967, Broadcasting made separate purchases of television equipment from RCA for an amount in excess of $750,000. Payment for these purchases was secured by two chattel mortgage agreements between Broadcasting and RCA. It is not disputed that these documents were the equivalents of security agreements under the Uniform Commercial Code as adopted in Ohio. The financing statements named Broadcasting as the debtor and were filed by RCA in the office of the Secretary of State of Ohio and in the office of the County Recorder.

On March 17, 1967, a second corporation was formed under the laws of Ohio under the name of Kittyhawk Television Corporation, having the same shareholders, officers and directors as Broadcasting and both corporations occupying the same place of business. At a meeting of the directors on the same date it was decided to effect a transfer of all of the assets and liabilities of Broadcasting to Television with the exception of an application for an AM radio license that was to remain the property of Broadcasting. The stated purpose of this transfer was to separate the television and possible radio activities into different operations. In June of 1967, this design was accomplished when Television acquired all of the assets and assumed all of the liabilities of Broadcasting, except for the radio license application.[1] In addition all of the stock of Television was issued on a pro rata basis to the shareholders of Broadcasting. Meanwhile, the president and general manager of the television station notified RCA that Broadcasting had "assigned all of its rights, title and interest in [the RCA] contracts" to Television. By the same letter, he also informed RCA that the shareholders, officers and directors of the two corporations were "exactly the same." In its reply, RCA stated that it had marked its records to reflect "the change of the corporate name to Kittyhawk Television Corporation." RCA enclosed new notes and also Transfer of Equity papers[2] for each of the chattel mortgage agreements. The notes and the Transfer of Equity agreements were to be executed by Television and Broad-

1. On June 19, 1967, both the shareholders and directors of Kittyhawk Broadcasting resolved to dismiss the company's AM license application in return for a $25,000 payment to be made by Gem City Broadcasting, Inc. It is not apparent from the record whether this transaction was ever accomplished.

2. The Transfer of Equity papers were executed by Broadcasting and Television for the two outstanding contracts with RCA. These documents stated that Broadcasting, the "Purchaser," having bought equipment from RCA, was now transferring its equity in said items to Television, the "Transferee." The agreement listed the amount still due RCA and reserved for RCA all of its rights against the Purchaser (Broadcasting) under the original sales agreement. The forms were then signed by a single individual who acted as president for both Television and Broadcasting.

casting and then were to be returned to RCA for its approval. Upon the return of the materials, RCA placed its consent on the Transfer of Equity documents and later filed one such document with the Secretary of State. It made no other filing reflecting the name of Kittyhawk Television Corporation.

From July 1967 through April 1970, Television made payments on the notes, but ultimately in July 1971 the corporation was adjudicated a bankrupt upon an involuntary petition. Broadcasting has not been similarly adjudicated a bankrupt, and its present status is not clear from the record.

The issue on this appeal is whether RCA's perfected security interest in the equipment when it was in the possession of Broadcasting survived the subsequent transfer of assets to Television.[3] To resolve this issue we first consider whether the transaction was a "sale, exchange, or other disposition" of the collateral under Ohio Revised Code (O.R.C.) Sec. 1309.-25(B) [UCC 9–306(2)].[4]

On its surface the transfer arrangement appears to have been a sale, exchange, or other disposition of property between two separate legal entities requiring application of Sec. 1309.25(B). However, upon closer analysis, we view the transaction as actually amounting to no more than a change of name by the debtor insofar as the filing requirements of the Uniform Commercial Code are concerned. This conclusion is dictated by two factors in the present case: (1) the ownership of the corporations and the purposes for their existence; and (2) the purposes of the Uniform Commercial Code's filing requirements. Regarding the first consideration, it is significant that the officers, directors and shareholders of the two corporations were identical. Moreover, the minutes of the first board of directors' meeting of Television reflect that the board was acting for both corporations simultaneously. When the transfer was finally accomplished, Television issued all of its stock to the shareholders of Broadcasting on a pro rata basis. Because of this complete identity of ownership and control of the two corporations, the assumption of liabilities and transfer of assets could hardly be treated as the kind of sale, exchange or disposition contemplated by Sec. 1309.25(B).

According to the corporate minutes, the purpose of the arrangement was legally to "separate the television interests from the AM interest." At that time the only radio interest Broadcasting possessed was an application filed with the Federal Communications Commission for permission to operate a standard broadcast station. Except for this potential radio interest, Broadcasting was concerned exclusively with its television activities. After the transfer, Kittyhawk Television performed virtually the same corporate function as Broadcasting had

---

3. Ohio Revised Code requires filing of financing statements both in the office of the Secretary of State and in the office of the County Recorder where the debtor has a principal place of business. O.R.C. Sec. 1309.38(A)(3). It is evident from the exhibits that RCA did not file one of its financing statements with the County Recorder until some four years after it first entered into a security agreement with Broadcasting. The trustee does not challenge this delay, and we discern no reason to conclude that the original security interest was not perfected. Thus for the purposes of this appeal, we shall consider the security interest of RCA to have been a perfected one as to Broadcasting.

4. The applicable law in this case is that of Ohio. Section 1309.25 provides in pertinent part:

Proceeds defined; secured party's rights on disposition of collateral.

．　　．　　．　　．　　．

(B) Except where sections 1309.01 to 1309.50, inclusive, of the Revised Code otherwise provide, a security interest continues in collateral notwithstanding sale, exchange, or other disposition thereof by the debtor unless his action was authorized by the secured party in the security agreement or otherwise, and also continues in any identifiable proceeds including collections received by the debtor.

．　　．　　．　　．　　．

performed, viz., television broadcasting. Interestingly enough, at the same time that the shareholders approved the acquisition of the Broadcasting assets by Television, they also agreed to the dismissal of the AM application, the only asset that had been expressly excluded from the transfer.[5]

As evidenced by their corporate minutes and their subsequent actions, the directors desired to transfer the television assets of Broadcasting into a separate corporation with a different name. This could have been done by simply changing the name of Broadcasting to Television, issuing new stock and executing new notes. Thereafter, Television could have held the radio interest until the directors could decide whether to dismiss the license application or to pursue it further. If they had eventually obtained FCC approval of the application, they could then have created a new corporation for the radio operation. For whatever reason, the directors took a different path to reach the same goal. Under the facts of this case and in order to effectuate the purposes of the Uniform Commercial Code, we think it is proper to disregard the form of the transaction and instead to focus upon its substance.

■ As we conclude that what took place was essentially a mere name change and not a sale or exchange within the meaning of Sec. 1309.25(B), that Section is not controlling. Rather, analysis must focus upon the filing provisions of the Uniform Commercial Code. The formal requisites of a financing statement are prescribed by O.R.C. Sec. 1309.39.[6] The simplified form of the

---

5. See n. 1, *supra.*

6. 1309.39 (UCC 9–402) Formal requisites of financing statement; amendments.

(A) A financing statement is sufficient if it is signed by the debtor and the secured party, gives an address of the secured party from which information concerning the security interest may be obtained, gives a mailing address of the debtor and contains a statement indicating the types, or describing the items, of collateral. A financing statement may be filed before a security agreement is made or a security interest otherwise attaches. When the financing statement covers crops growing or to be grown or goods which are or are to become fixtures, the statement must also contain a description of the real estate concerned and the name of the record owner or record lessee thereof. A copy of the security agreement is sufficient as a financing statement if it contains the above information and is signed by both parties.

(B) A financing statement which otherwise complies with division (A) of this section is sufficient although it is signed only by the secured party when it is filed to perfect a security interest in:

(1) collateral already subject to a security interest in another jurisdiction when it is brought into this state. Such a financing statement must state that the collateral was brought into this state under such circumstances.

(2) proceeds under section 1309.25 of the Revised Code if the security interest in the original collateral was perfected. Such a financing statement must describe the original collateral.

(C) A form substantially as follows is sufficient to comply with division (A) of this section:

Name of debtor (or assignor) ........
Address ...........................
Names of secured party (or assignee)
.................................
Address ...........................
1. This financing statement covers the following types (or items) of property:
(Describe) .........................
2. (If collateral is crops) The above described crops are growing or are to be grown on:
(Describe Real Estate) ..............
which is (owned by or leased to) .....
3. (If collateral is goods which are or are to become fixtures) The above described goods are affixed or to be affixed to:
(Describe Real Estate) ..............
which is (owned by or leased to) .....
4. (If proceeds or products of collateral are claimed) Proceeds—Products of the collateral are also covered.
Signature of Debtor (or Assignor) ....
Signature of Secured Party (or Assignee) ..............................

(D) The term "financing statement" as used in sections 1309.01 to 1309.50, inclusive, of the Revised Code, means the original financing statement and any amendments, but if any amendment adds collateral, it is effective as to the added collateral only from the filing date of the amendment.

(E) A financing statement substantially complying with the requirements of this section is effective even though it contains minor errors which are not seriously misleading.

statement reflects the policy of the Code that notice filing is all that is required. In re Kalamazoo Steel Process, Inc., 503 F.2d 1218 (6th Cir. 1974). As set out in subsection (E), a financing statement containing minor errors is effective so long as it is in substantial compliance with the requirements of the prior subsections. Generally, the courts have held that a financing statement is valid even though it incorrectly names in some minor way one or both of the parties.[7] See In re Excel Stores, Inc., 341 F.2d 961 (2d Cir. 1965); In re Platt, 257 F.Supp. 478 (E.D.Pa.1966). The rationale of these "mistake" cases is that the name, although technically incorrect, is sufficiently accurate to put a third party on notice to inquire further.

The present case, of course, did not arise on account of a mistake in filing. When RCA filed the original financing statements, ·it correctly identified the debtor as Kittyhawk Broadcasting. These documents failed to reflect the exact name of the debtor only after the equipment subject to the security interests was acquired by Television. Except for the change from Broadcasting to Television, the financing statements were accurate in every other detail. The Code

does not contain an express provision requiring a refiling of a financing statement nor an amendment whenever the debtor changes its name. What the Code does mandate is that the financing statement must substantially comply with the essential requirements set forth in Sec. 1309.39. If the statement is seriously misleading, the Code provides for an amendment of the financing statement to correct the inaccuracy. O.R.C. Sec. 1309.39(E).

■ We do not believe that RCA had any obligation under the Code on the facts of this case to amend its financing statements to show that a minor change had been made in the name of the debtor. Cf. In Re Vieths, Inc., 9 UCC Rep. Serv. 943 (E.D.Wis.1971).[8] Of course, the Code seeks to protect against the "secret lien," yet it also adheres to the concept of notice filing. In this conflict between two policies, we conclude that the names of the debtor were sufficiently similar that a third party could reasonably be expected to be put on notice or at least to be required to make further inquiry. This situation is to be distinguished from an intentional name change expressly provided for in the security agreement itself where the new

---

7. *See also* Annot., 30 A.L.R.3d 9 (1970); J. White and R. Summers, Uniform Commercial Code § 23–16, 837–41 (1972).

8. The *Vieths* case involved a similar situation to the one in the present case. There the debtor, Kuhn, ran a sole proprietorship called "Vieths." When the bank filed its financing statement, the document listed Kuhn as the debtor and was indexed only under his name. Later, with the knowledge of the bank, Kuhn changed his operation to "Vieths, Inc." Kuhn then transferred his property to the corporation in return for stock. Although new notes were executed, the bank did not refile its financing statement. The bankruptcy judge decided that the bank had lost its security interest because a third party could not have been expected to discover a lien on the property of Vieths, Inc. when it was filed under the name of Kuhn. We think that this decision is not inconsistent with our holding in this case. Here, unlike in In Re Vieths, Inc., there was no substantial danger that a third party would not discover the existence of a "secret lien." *But see* In Re Pasco Sales Co., Inc., 354 N.Y.S.2d

402 (Sup.Ct.1974); In Re Gac, 11 UCC Rep. Serv. 412 (W.D.Mich.1972) for the proposition that the Code does not require a secured party to refile even when it knows that the debtor has changed its name to one not closely related to its former name. A draft amendment to the Code has been proposed to clarify this problem, but it has not been adopted in Ohio. The relevant portion of the proposal provides:

Revised UCC § 9–402(7)

A financing statement sufficiently shows the name of the debtor if it gives the individual, partnership or corporate name of the debtor, whether or not it adds other trade names or the names of partners. Where the debtor so changes his name or in the case of an organization its name, identity or corporate structure that a financing statement becomes seriously misleading, the filing is not effective to perfect a security interest in collateral acquired by the debtor more than four months after the change, unless a new appropriate financing statement is filed before the expiration of that time.

name so provided for bears no resemblance to the former name of the debtor. In such a situation we have held that the threat of a secret lien outweighs any additional burden on the secured party to amend its financing statement or to file the security agreement itself as a financing statement as the Code permits. *See* In Re Kalamazoo Steel Process, Inc., *supra.* Since under the facts of the present case there was little danger of a secret lien, the difference in names should be considered as minor and not seriously misleading. Consequently, we hold that the financing statements substantially complied with the provisions of the Ohio law, and that the security interests were perfected as to and enforceable against the trustee in bankruptcy.

Reversed and remanded for any necessary further proceedings consistent with this opinion.