**NRT METALS, INC., Plaintiff,**

**v.**

**MANHATTAN METALS (NON–FER-ROUS) LTD., Albourne Partners, Leicester Partners and Worcester Partners, Defendants.**

**No. 80 Civ. 7125 (RLC)**

United States District Court, S.D. New York.

Dec. 7, 1983.

Gifford, Woody, Palmer & Serles, New York City, for plaintiff; James P. Beggans, Jr., New York City, of counsel.

Parker Chapin Flattau & Klimpl, New York City, for defendants; Barry J. Brett, New York City, of counsel.

## OPINION

.ROBERT L. CARTER, District Judge.

Plaintiff, NRT Metals, Inc. ("NRT"), a New York corporation, is being voluntarily liquidated without court process. It has brought this declaratory judgment action against Manhattan Metals, Ltd. ("Manhattan"), Albourne Partners, Leicester Partners, and Worcester Partners ("the partnerships") to determine whether, as plaintiffs argue, defendants are to be treated as general creditors under the Liquidation Plan adopted by NRT, or as preferred creditors, as defendants urge.[1] For the reasons below, the Court finds that defendants were improperly classified as general creditors.

*Background*

Concretely, the dispute in this case is over $220,000 [2] that defendants transferred to plaintiff in connection with certain investment transactions. Plaintiff deposited those funds in its own accounts, which became part of plaintiff's general estate for purposes of liquidation. Plaintiff's Liquidation Plan provides that the estate will be

---

1. There was no trial in this case; the parties had agreed to submit all issues for decision on their papers.

2. NRT is indebted to defendants for $226,-582.39, but the parties agree that this suit con-

cerns only the $220,000 paid by defendants to plaintiff on or about March 7, 1980, and March 13, 1980, in connection with the transactions on or about those dates.

distributed on an equal basis to defendants and other creditors (except those who have secured interests).[3] Defendants argue that the $220,000 in question should never have been considered as part of the plaintiff's funds, and therefore, should now be returned to defendants as a priority distribution in the liquidation proceedings.

Whether plaintiff properly treated defendants' funds as its own is, however, but one level of the issues in this case. As both parties concede, the propriety of plaintiff's actions can be judged only with reference to the nature of the transactions underlying the $220,000 transfer. These transactions resulted from discussions between the parties, which began in the second half of 1979. NRT was a merchant firm which engaged principally in buying and selling cash commodities, specifically metal. Manhattan was a registered futures commission merchant ("FCM"), which conducted trading activities on its own behalf and for the partnerships. The partnerships were formed for the purpose of making investments with tax consequences for those who invested therein. The parties, through Richard Illingworth, President of Manhattan and a general partner of the partnerships, and James Holme, Executive Vice President of NRT, mainly talked about possible investment transactions involving copper arbitrage on two markets: the Commodity Exchange ("COMEX") in New York and the London Metal Exchange ("LME").

After additional meetings between Illingworth and Michael Cameron, President of NRT, the parties came to an apparent agreement concerning the investments NRT would make for the partnerships.[4] On or about March 7, 1980, NRT purchased 22 futures contracts for 275 short tons of copper in New York (COMEX) and sold futures contracts for 250 metric tons of copper on the LME.[5] Again, on or about March 14, 1980, NRT purchased 22 futures contracts for 275 short tons of copper in New York (COMEX) and sold futures contracts for 250 metric tons of copper on the LME. It was in conjunction with these two transactions that defendants delivered to NRT checks totaling $220,000.[6]

Plaintiff says that the transactions were structured by the parties as "physical trades", which involve the actual purchase and sale of commodities between merchants on what may be termed the physical market, which is unregulated. Its position with respect to the $220,000 is that the money represented "margin" that *plaintiff* would have to post in order to hedge its physical trades. Plaintiff claims that defendants were obligated to supply those funds, and once provided, defendants knew they would lose all indicia of belonging to defendants. According to defendants, however, they forwarded the $220,000 to plaintiff as original margin in compliance with the rules established by COMEX, a regulated exchange covered by the Commodity Exchange Act, ("the Commodity Act"), 7 U.S.C. § 1 *et seq.* They argue that the transactions were covered by the Commodity Act since the defendants were investing for trading or investment purposes only, with neither the intention nor the capability of accepting the vast amounts of copper involved in the transactions. Since section 4d of the Commodity Act, 7 U.S.C. § 6d(2), provides that such margin funds are to be separately accounted for, and treated as funds of the customer, defendants maintain that plaintiff, in the context of the liquidation proceeding, has no right

---

3. Plaintiff's Exh. 1, Plan of Liquidation at 6, (Liquidator has discretion to make distributions consistent with orderly liquidation of corporation and with equal treatment of similarly situated creditors).

4. *See* Defendants' Exh. L, letter from Richard Illingworth to Michael Cameron concerning New York-London copper arbitrage to be commenced on defendants' initiative.

5. Two hundred and seventy-five (275) short tons of copper is roughly equivalent to 250 metric tons of copper.

6. Joint Pre-Trial Order, stipulations 11 and 13, (on or about March 7, 1980 and March 13, 1980 each of the partnerships delivered to NRT a check; on each date the three checks totalled $110,000).

to treat such funds on the same basis as its general estate.[7]

To this plaintiff responds by invoking the policy of the Bankruptcy Code, 11 U.S.C. § 101 *et seq.* Even if it should have segregated defendants' funds, plaintiff maintains, to the extent it did not do so, defendants' claims remain on par with those of the general creditors of the plaintiff. As a corollary point, plaintiff also contends that to give defendants the requested relief in this case would be tantamount to creating a "trust fund" post hoc, in effect establishing a "secret lien" in violation of the Bankruptcy Code.

Despite the several sub-issues raised in this case, mainly by plaintiff, there are ultimately two questions that appear dispositive. First, do the transactions between the parties come within the scope of the Commodity Act, that question predicating the determination of whether the funds transferred by defendants to plaintiff were margin monies subject to § 4d of the Commodity Act; and second, does the fact that plaintiff commingled defendants' funds with its own prevent defendants from obtaining any relief in this case, necessarily

deciding whether the Bankruptcy Code can control the Court's determination of this issue in the context of a voluntary, non-judicial liquidation proceeding. These questions are addressed in turn.

*Determination*

I

A. Broad Scope of the Commodity Act

Plaintiff makes a difficult argument in claiming exclusion from the Commodity Act's broad scope. The first version of the Act was passed in 1921.[8] It succeeded a series of federal and state legislative attempts to abolish entirely all futures trading activity, which efforts had been inspired by abuses resulting from speculative excesses on the newly developed exchanges for futures trading.[9] The idea of regulation having triumphed, it took hold firmly. For the past 60 years, Congress, through amendments and revisions, has consistently broadened the strength and scope of commodity futures trading regulation. *See Leist v. Simplot,* 638 F.2d 283, 294–96 (2d Cir.1980), *aff'd sub nom., Merrill Lynch v. Curran, Pierce, Fenner & Smith,* 456 U.S. 353, 102 S.Ct. 1825, 72 L.Ed.2d 182 (1982).

---

**7.** Section 4d of the Commodity Act provides that any person acting as futures commission merchants must:

> treat and deal with all money, securities, and property received by such person to margin, guarantee, or secure the trades or contracts of any customer of such person, or accruing to such customer as the result of such trades or contracts, as belonging to such customer. Such money, securities, and property shall be separately accounted for and shall not be commingled with the funds of such commission merchant or be used to margin or guarantee the trades or contracts, or to secure or extend the credit, of any customer or person other than the one for whom the same are held....

7 U.S.C.A. § 6d (Supp.1983).

**8.** The Futures Trading Act, 42 Stat. 187 (1921) was declared unconstitutional, *Hill v. Wallace,* 259 U.S. 44, 42 S.Ct. 453, 66 L.Ed. 822 (1921), but was redrafted immediately and enacted in 1922 as the Grain Futures Act, 42 Stat. 998 (1922). The Commodity Act was given its current name in 1936, The Commodity Exchange Act, 49 Stat. 1491 (1936).

**9.** Broadly speaking, futures trading arose out of the recognition that profits could be made from

fluctuations in the market price of commodities covered by contracts for future delivery. For example, a speculator who anticipated a price decrease in a certain commodity market might agree to a future sale of the commodity at the current market price, although he owned none of the commodity itself, intending to purchase the commodity contract at a reduced price on or before the set delivery date. Conversely, a speculator anticipating a market incline might acquire a contract to purchase a commodity, without intending to take delivery, but with the purpose of later reselling the futures contract at a higher price. *See Merrill Lynch, Pierce, Fenner & Smith v. Curran,* 456 U.S. 353, 358–59, 102 S.Ct. 1825, 1828–29, 72 L.Ed.2d 182 (1980).

Recognized exchanges or boards for these and similar types of transactions developed in the 19th century. *See S.Rep. No. 850,* 95th Cong.2d Session 6, *reprinted in 1978 U.S.Code Cong. & Ad.News,* 2087, 2094. The futures market on these exchanges began to provide "the common language of price" and the standard commercial practices needed for greatly increased commerce in grains and cotton, but it was contested whether the economic services of the developing system allowed more benefits or abuses. *Id.*

■ The purpose of the Act is stated expansively: to ensure fair practices and honest dealing on the Commodity Exchanges and to control manipulative activity and speculative excesses that undermine the markets. *See S.Rep. No. 850*, 95th Cong. 2d Session 12, *reprinted in 1978 U.S.Code Cong. & Ad.News* 2087, 2100.[10] While the immediate beneficiaries of healthy futures markets are the producers and processors of commodities who can minimize the risk of loss from wide fluctuations in cash market prices by hedging on the futures markets, the Supreme Court recently affirmed the necessarily broad reach of the Act's protections. The speculator, the Court held, was the beneficiary of the Act's regulatory scheme, as much as was the hedger. *Merrill Lynch, Pierce, Fenner & Smith v. Curran, supra* at 390, 102 S.Ct. at 1845.[11] Moreover, the Act casts a wide net in regulating different types of futures trading. The Act pertains not only to the agricultural commodities, which composed its original concern, but also to "all other goods and articles ... and all services, rights and interests in which contracts for future delivery are presently or in the future dealt in," 7 U.S.C. § 2, an enlargement due to the continued expansion of futures contracts based on new commodities. *See S.Rep. No. 850, supra* at 13, *U.S.Code Cong. & Ad.News, supra* at 2101. *See also Commodity Futures Trading Commission v. American Board of Trade*, 473 F.Supp. 1177, 1180–82 (S.D.N.Y. 1979) (Broderick, J.).

■ In making its argument, plaintiff latches onto the Act's exemption for agreements which are made on a "cash forward" basis. That is, section 2(a)(1) of the Act provides the Futures Trading Commission with regulatory jurisdiction over "contracts of sale of a commodity for future delivery," but provides that the term "future delivery" is not to refer to "any sale of any cash commodity for deferred shipment or delivery." 7 U.S.C. § 2. Plaintiff claims that the copper transactions at issue here were models of such deferred delivery sales.

The exemption referred to is a narrow one. It originated in the 1921 Act, 42 Stat. 187 (1921) to meet a particular need: it allowed a farmer to sell part of the next season's harvest at a set price to a grain elevator or miller. *See S.Rep. No. 212*, 67th Cong. 1st Session 1 (1921), *H.R.Rep. No. 345* 67th Cong. 1st Session 7 (1921). The exemption clearly encompassed only those contracts which promised the actual delivery of grain at a specified time in the future. The more recent version of the Act kept intact the exemption's limited exclusion, confirming the notion that a cash forward contract is one in which the parties contemplated physical transfer of the actual commodity. *Commodity Futures Trading Commission v. Co Petro Mktg.*, 680 F.2d 573, 578 (9th Cir.1982), citing *H.R. Rep. No. 975*, 93d Cong. 2d Session 129–30 (1974).[12] "There is nothing in the legisla-

---

**10.** According to the Senate Report accompanying the Futures Trading Act of 1978, this goal was based upon findings and conclusions of Congress that:

(1) transactions in commodity futures are carried on in large volume by the public, as well as by persons engaged in the business of buying and selling commodities in interstate commerce;

(2) such transactions are susceptible to manipulation and control, and may generate sudden and unreasonable price fluctuations; and

(3) such fluctuations are a burden upon interstate commerce and make regulation essential in the public interest.

*S.Rep. No. 850, supra* at 12, *reprinted in 1978 U.S.Code Cong. & Ad.News, supra* at 2100.

**11.** The Court wrote: "Although the speculator has never been the favorite of Congress, Congress recognized his crucial role in an effective and orderly futures market and intended him to be protected by the statute as much as the hedger." *Merrill Lynch, Pierce, Fenner & Smith v. Curran, supra* at 390, 102 S.Ct. at 1845 (1982).

**12.** Describing a typical cash forward contract from the House Report on the 1974 Amendments to the Commodity Act, the Ninth Circuit in *Commodity Futures Trading Commission*, used the example of a farmer who wants to convert 5,000 bushels of wheat into cash.

He seeks a buyer such as a grain elevator for whom the wheat has "inherent value." The wheat has "inherent value" for the grain elevator because the elevator "is in contact with

tive history surrounding ... [the exclusion] to suggest that Congress intended to encompass agreements for the future delivery of commodities sold ... for ... speculation." *Id.* at 579.

Despite plaintiff's assertions that as a corporation of professional metal traders it dealt primarily in "physical" trades, plaintiff's proof of the physical nature of the particular transactions with Manhattan and the partnerships is negligible. Stipulated is the fact that the defendants never maintained any facilities which could accommodate physical delivery of the 500 metric tons contemplated in the transactions. Furthermore, Manhattan and the partnerships offset each of their purchases; they simultaneously bought futures contracts for copper in New York (COMEX) and sold futures contracts in London on the LME. (Defendants' Exh. S). Not only does such a transaction disavow intentions to assume physical possession of the copper involved, it typifies the kind of transactions covered by the Commodity Act. *See In Re Stovall, Comm.Fut.L.Rep.* (CCH) ¶ 20,941 at 23,778 (Commodity Futures Trading Comm'n 1979) (most parties to commodity futures contracts extinguish their legal obligations to make or take delivery by offsetting their contracts with equal and opposite transactions prior to date on which delivery is called for).

**B. Terminology of Futures Exchange Transactions**

█ In other ways as well the structuring of the agreements between the parties resembled a speculative futures exchange far more closely than it did a physical trade. There was little, if any, negotiation concerning the mechanics of the transactions. In general, however, certain terms would be negotiated in arranging a physical trade—the precise nature of the copper involved, a particular delivery point, and a fixed delivery date. (Illingworth Dep. 23–24; Holme Dep. 56–57). Such negotiations would be unnecessary in futures trading on COMEX since it is carried out through standardized contracts with price the only term not fixed. The terms of the contracts here did, in fact, conform to the standard. Delivery was set for one of the various designated COMEX warehouses and the agreements specified the sale and purchase of a single variety of copper. Further, regardless of the recordings made by plaintiff on its own books, the understanding between the parties was in terms of *contracts* to be purchased and sold, rather than in terms of specific tonnage quantities, more generally found in physical trades. (Defendants' Exh. L).

The payment to plaintiff of a commission and the use of the term "margin" to depict certain payments made by defendants to plaintiff also strengthen the improbability that physical trades were the intended arrangement between the parties. As Holme testified, NRT was not generally paid a commission for effecting physical trades, except in some joint venture cases. He could identify no circumstances in which NRT was paid a commission on what it called physical trades other than its transactions with the defendants. (Holme Dep. 58–59). Plaintiff, nevertheless, maintains, without support, that NRT had no way, other than by charging the defendant directly, to obtain compensation in an arbitrage situation, implying that the use of the term "commission" was merely a convenient denomination for such a charge.[13]

---

potential buyers such as the flour miller, and has the facilities to store, condition, and load out the grain and earn additional income from these services." The wheat also has "inherent value" to the flour miller, who can increase its utility and value by grinding it into flour. A cash forward contract is common in these kinds of transactions because it guarantees the miller, for example, a price but allows delivery to be deferred "until such time as he could process the wheat."

*Commodity Futures Trading Commission v. Co Petro Mktg., supra* at 578, (*House Report* citations omitted).

**13.** Weis, engaged by Manhattan in a trading advisory capacity, testified that a purchaser of physical commodities would generally pay a premium for the quality assurance and delivery charge. (Weiss de bene esse Dep. at 17). Plaintiff did not refer to this form of compensation. In addition, Holme testified that in dealing with

This misnomer, as it were, is unfortunate in the context of this case. Commissions are generally charged by brokers dealing in futures contracts. *Leist v. Simplot, supra* at 287.

Margin, moreover, is a well-accepted facet of an investment in the commodity futures market, a security deposit obtained by a broker from a customer to protect against adverse price movements. *Id.* All of the documents reflecting discussions concerning the transactions clearly refer to margin payments and the amount of margin charged by plaintiff accords exactly with the COMEX margin requirements.[14] Plaintiff's explanation for use of that term is completely unsubstantiated. Holme, indeed, presented a different theory of the margin requirement. He claimed that NRT required it as "a security to enter into business" (Holme de bene esse Dep. 39), practically rephrasing the above definition of margin funds.

Plaintiff appears to argue, nevertheless, that defendants knew that it was a physical trader, not a registered FCM, which precluded it from carrying out futures commodity trades on defendants' behalf.[15] The argument is without impact in light of other facts disclosed to defendants by plaintiff in this case. Holme revealed to Illingworth in their initial meetings that NRT was associated with Drexel Burnham Lambert ("Drexel")[16] through a joint shareholder and that NRT was doing most of its commodity business through Drexel on the COMEX, and some of it on the LME. Holme explained that Drexel had a service whereby for purposes of arbitrage trading, variation margins for the New York and London Exchanges could be offset, which would allow defendants to avoid double margin requirements.

Holme acceded that Illingworth had told him that he would like to be able to do "some of the type of business ... [that Holme] indicated ... [NRT] had with Drexel." (Holme de bene esse Dep. 5–6, 9). Illingworth also indicated that in dealing with NRT, he thought NRT would be dealing through Drexel. (Illingworth Dep. 79–80). The letter from Illingworth to Holme describing the agreements the two had come to after their meetings included this understanding. (Defendants' Exh. R). Therefore, plaintiff itself assuaged whatever doubts defendants may have had regarding NRT's status and abilities to engage in futures trading.

■ For all of the above reasons, plaintiff has failed to persuade the Court that the transactions at issue here were conducted as physical trades.[17] Consequently, there is no basis for concluding that the $220,000 at issue was not transferred by

---

physical metals, NRT was trying to make money on disparities in prices or price movements. (Holme Dep. at 58–59).

**14.** Defendants' Exh. L, letter from Richard Illingworth to Michael Cameron, January 2, 1979 (sic); Exh. R, Letter from Richard Illingworth to James Holme, Dec. 3, 1979. Plaintiff never attempted to correct defendants' understanding of the agreement concerning margin deposits. Further, the parties had originally agreed to set margin at $3,000.00, which was subsequently raised to $5,000.00, corresponding to the same increase in the COMEX requirement. (Joint Pre-Trial Order, Stipulation 8–9).

**15.** "Futures commission merchant" means and includes "individuals, associations, partnerships, corporations, and trusts engaged in soliciting or in accepting orders for the purchase or sale of any commodity for future delivery on or subject to the rules of any contract market and that, in or in connection with such solicitation or acceptance of orders, accepts any money, securities, or property ... to margin, guarantee, or secure any trades or contracts that result or may result therefrom." 7 U.S.C. § 2.

The Court need not decide here whether plaintiff acted illegally as an FCM. With respect to plaintiff's assertion, however, the Court notes that there is evidence in the record of other futures trades, in which NRT was involved. (Defendants' Exhs. A–G).

**16.** Drexel was a New York brokerage firm. Banque Lambert, a foreign banking company, had an equity interest in NRT and also had an ownership interest in Drexel. (Holme Dep. 39–41).

**17.** The party who institutes the declaratory judgment action carries, at a minimum, the risk of non-persuasion, if not the actual burden of proof. *See* Wright, Miller & Kane, *Federal Practice and Procedure* § 2770, pp. 762–763 (1983).

defendants to plaintiff as margin, required for speculative copper purchases and sales on COMEX in compliance with COMEX rules. Pursuant to section 4d of the Act, 7 U.S.C. § 6d(2), it is clear that these funds should have been segregated as monies belonging to defendants.

The next question is whether defendants are now entitled to recover these funds as preferred creditors in the liquidation proceedings.

## II

### A. Rule 16

■ Preliminarily, the Court must address defendants' Rule 16, F.R.Civ.P., objection to consideration of plaintiff's argument on this question. Plaintiff's argument is that because it admittedly commingled with its own funds the monies which defendants gave it, the Court is now prevented from giving defendants any preference over plaintiff's general creditors under the policy established by the Bankruptcy Code. Defendants contend that nothing in the complaint or pre-trial order suggested any issues related to the Bankruptcy Code and because Rule 16 provides that the pretrial order "when entered controls the subsequent course of the action unless modified at the trial to prevent manifest injustice," plaintiff should be prevented from now presenting those issues, and the Court's decision should not be based upon them. Plaintiff's position is that the joint pre-trial order "does not foreclose any particular legal theories." (Plaintiff's letter to the Court, June 24, 1983).

Plaintiff's position is unsupported by any judicial interpretations of F.R.Civ.P. 16. The policy behind Rule 16—to limit the trial to those issues that are actually in dispute—would be crippled were pre-trial orders held to have no binding effect upon the parties. *See G & R Corp. v. American Security & Trust Co.,* 523 F.2d 1164, 1173 (D.C.Cir.1975). Considering the posture of this case, however, the Court is unwilling to foreclose discussion of the issue plaintiff

now claims controls its outcome. (Plaintiff's Reply Brief, 1–2). Defendants have had a meaningful opportunity through their reply papers to address plaintiff's argument and cannot, therefore, claim surprise and unfairness in this regard. *See Union Planters Nat'l Bank v. Commercial Credit,* 651 F.2d 1174, 1188 (6th Cir.), *cert. denied,* 454 U.S. 1124, 102 S.Ct. 972, 71 L.Ed.2d 111 (1981) (pre-trial orders are designed to expedite litigation and eliminate surprise by framing issues remaining for trial). Moreover, at least part of the issues raised by plaintiff—the form of relief which may be granted—is endemic to disposition of this case and both parties should have been prepared to address it. Therefore, Rule 16 does not bar the Court from determining the issue plaintiff raises.

### B. Application of the Bankruptcy Code and the Tracing Requirement

■ Specifically, plaintiff first argues that under the Bankruptcy Code, defendants should not be granted a preference because this would create a secret lien. As a second point, again made in reliance on the Code, plaintiff contends that it is defendants' burden to trace their funds to specific assets of the plaintiff before they can assert a preference. Otherwise, plaintiff insists, it would be possible for defendants to "assert a preference through a speculative suggestion that its 'trust funds' are among the debtors' general assets." (Reply Brief at 6).

As a threshold consideration, the plaintiff's reliance on the Bankruptcy Code is questionable, at best. Plaintiff says it would have proceeded under Chapter 11, 11 U.S.C. § 1129, but chose not to do so in order to avoid "needless expense." (Brief at 3). This choice, it must be noted, also enabled plaintiff to avoid judicial review of the Liquidation Plan up to this point. The Bankruptcy Code, in contrast, requires confirmation of the Liquidation Plan by the Bankruptcy Court before the plan may be effected.[18] The Code provides, *inter alia,*

---

**18.** For purposes of confirmation of a Chapter 11

Plan, section 1128(a) requires that notice be

that the Court determine that any payments made before confirmation of the plan are reasonable, 11 U.S.C. § 1129(a)(4)(B)(i), and that each class of creditors has accepted the plan. 11 U.S.C. § 1129(a)(7).[19] The plaintiff's adoption of the Liquidation Plan in this case did not afford defendants any of these protections, and the inequities of permitting plaintiff to invoke the Code's protections at this point are plain. Moreover, plaintiff has not affirmatively suggested any reasons why the Code should be applied here.

It is also clear that with respect to plaintiff's first argument, reliance on the concept of a "secret lien" is inappropriate. Undoubtedly, the Code seeks to protect subsequent creditors who rely upon the absence of other liens to lend money to a debtor, which is the reason for the Code's guard against the establishment of a "secret lien". *In Re Kittyhawk Television Corp.*, 516 F.2d 24 (6th Cir.1975). Here, however, the guard was unnecessary. The partnerships delivered the sums in question on the eve of plaintiff's formal declaration of insolvency and there is no suggestion in the record that any creditor advanced monies to plaintiff subsequent to the deposit of these funds. No creditor has since come forward to claim that it could be disadvantaged on account of the dispute between NRT and the partnerships. Nor is there any indication that plaintiff's insolvency

came about as a result of the investments discussed here.

■ Similarly, plaintiff's argument that defendants are barred from priority treatment because of their inability to trace the funds transferred is unconvincing, even putting aside the question of the Bankruptcy Code's application here. Defendants have traced sufficiently the funds they transferred to satisfy the asserted requirement. NRT declared insolvency on March 13–14, 1980. Defendants had delivered to plaintiff their second margin installment on or about March 13. On or about March 19, 1980, defendants' trading positions placed with NRT were liquidated, closing out all positions taken by the parties, and on or about the 19th or 20th of March, defendants requested the return of all the margin funds transferred. On March 20, 1980, stockholders of NRT voted that the corporation undertake a voluntary non-judicial liquidation. At that point, and on March 21, defendants were able to trace their funds in NRT's accounts at Chemical Bank.

Plaintiff maintains, however, that defendants should not receive any priority because they cannot trace the funds at the present time to any monies ever held or presently held by the liquidator under the Plan of Liquidation. That argument defers to form over substance. In making it

given to all parties in interest and that a hearing be scheduled for the purpose of determining whether the plan or plans filed in the case comply with the provisions of § 1129 of the Code.

**19.** The Bankruptcy Code states that:
the court shall confirm a plan only if all of the following requirements are met:
(1) The plan complies with the applicable provisions of this chapter.
(2) The proponent of the plan complies with the applicable provisions of this chapter.
(3) The plan has been proposed in good faith and not by any means forbidden by law.
(4)(A) Any payment made or promised by the proponent, by the debtor, or by a person issuing securities or acquiring property under the plan, does services or for costs and expenses in, or in connection with, the case, or in connection with the plan and incident to the case, has been disclosed to the court; and

(B)(i) any such payment made before confirmation of the plan is reasonable; or
(ii) if such payment is to be fixed after confirmation of the plan is reasonable.

(7) With respect to each class—
    (A) each holder of a claim or interest of such class—
    (i) has accepted the plan; or
    (ii) will receive or retain under the plan on account of such claim ... of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive ... if the debtor were liquidated under chapter 7 ... on such date; or
(8) With respect to each class—
    (A) such class has accepted the plan; or
    (B) such class is not impaired under the plan.
    ....
11 U.S.C. § 1129 (1982).

plaintiff contends that tracing is necessary to the date of the filing of the petition under the Bankruptcy Code and that April, the date of the Plan's adoption, is the date corresponding to that time. It cites no authority, and the Court can find none, in support of the proposition. An earlier analogy would seem more apposite. By resolution of the Board of NRT, approved by the shareholders on March 20, it was agreed that the only business to be conducted onward from March 16 would be related to liquidation. (Plaintiff's Exh. 1). Insolvency had already been announced. Defendants could identify their funds until sometime between the 21 and the 31, when plaintiff says the funds had been exhausted as a result of set-offs apparently taken by Chemical Bank and others. Indeed, particularly in light of these facts, plaintiff's argument seems untenable. The Court cannot now sanction plaintiff's incorrect determination regarding the character of defendants' funds, which contravenes a statutory obligation on plaintiff's part because plaintiff, despite notice of defendants' claims, disbursed those funds prior to adoption of the Liquidation Plan.[20]

Defendants are not required to trace their funds into the hands of those who received them after March 20, when NRT's stockholders voted to undertake a voluntary, non-judicial liquidation. Plaintiff should have kept defendants' funds apart from its own, and its use of those funds to reimburse other creditors for its past debts, with knowledge of defendants' claims, was improper. The Court finds that treatment of defendants as priority creditors is the appropriate relief in this case. Judgment is awarded for defendants in the amount of $220,000.00 plus interest as of March 20, 1980. Plaintiff is ordered to disburse to defendants on a priority basis any funds it has or may subsequently recover.

SUBMIT ORDER.

---

**20.** The Court notes only briefly that plaintiff's reliance on *In Re Weis Securities Inc.*, Fed.Sec.L. Rep. (CCH) ¶ 95,340 (Bankr.S.D.N.Y.1975), is problematic. *Weis* relied on *United States v. Randall*, 401 U.S. 513, 91 S.Ct. 991, 28 L.Ed.2d 273 (1971) in making the argument that "even if there was a duty to segregate the funds of unregulated commodity customers ... absent *actual* segregation there is no basis for impressing a trust on commingled funds to confer a benefit on a special class of creditors." *In Re Weis Securities Inc., supra* at 98,690. *Randall* dealt particularly with the juxtaposition of claims for administrative expenses of a trustee and claims by the United States for taxes, which should have been segregated from the debtor's general estate. Concluding that there was a progressive legislative development that marked the decline in the grant of a tax preference to the United States and marked an ascending priority for costs and administrative expenses, the Court declined to enforce a trust for the improperly commingled taxes.

*Randall's* vitality, however, appears to have been undercut by the new Bankruptcy Act of 1978. *See Selby v. Ford Motor Co.*, 590 F.2d 642, 648 (6th Cir.1978) (noting that the legislative history of § 541 of the new Act indicates some intent to modify or overrule the holdings of the *Randall* case). The effect this will have on the so called tracing requirement is still unclear. To the extent that *Weis'* holding is left intact, the Court respectfully declines to find it applicable in this context.