**TRANSNOR (BERMUDA) LIMITED, Plaintiff,**

v.

**BP NORTH AMERICA PETROLEUM, Conoco Inc., Shell Oil Company, BP Oil International Ltd., Conoco (U.K.) Ltd., Shell U.K. Ltd., Shell International Trading Co., and Exxon Corporation, Defendants.**

**No. 86 Civ. 1493 (WCC).**

United States District Court, S.D. New York.

April 18, 1990.

**1474**

Edward J. Swan, New York City, for plaintiff.

Davis, Markel & Edwards, New York City (Gregory A. Markel, David Dunn, Ann Alexander, of counsel), for defendants Conoco Inc. and Conoco (U.K.) Ltd.

Sullivan & Cromwell, New York City (William E. Willis, James H. Carter, Gandolfo V. DiBlasi, Michael Straus, William J. Snipes, of counsel), for defendant Exxon Corp.

## OPINION AND ORDER

WILLIAM C. CONNER, District Judge:

This action under the antitrust and commodity laws is before the Court on defendants' motion for summary judgment.

## BACKGROUND

Plaintiff Transnor (Bermuda) Ltd. ("Transnor") is a corporation established under the laws of Bermuda and with its principal place of business there. Transnor's suit arises out of its purchase of two cargoes of North Sea Crude Oil in December 1985 at an average price of $24.50 per barrel for delivery in Scotland in March 1986. Transnor refused to take delivery of these cargoes because their market value had declined after Transnor entered into the contracts.[1]

---

**1.** SITCO, a party to one of the contracts, obtained a judgment against Transnor for its default. Transnor settled with Nissho Iwai, a party to the second contract.

Transnor claims that remaining defendants Conoco Inc., Conoco (U.K.) Ltd. (collectively "Conoco") and Exxon Corporation ("Exxon"), conspired with the settling defendants[2] to cause a decline in crude oil prices by jointly selling cargoes of Brent blend crude oil ("Brent Oil") at below-market prices. Brent Oil is a blend of oils produced in various fields in the North Sea and delivered through pipelines for loading onto cargo ships at Sullem Voe in the Shetland Islands. By the end of March 1986, the price of a barrel of Brent Oil had dropped substantially to $13.80 per barrel, from $29.05 per barrel in November 1985. Transnor asserts claims against defendants for violations of the Sherman Act, 15 U.S.C. § 1 (1982), and sections 4(c), 6(b), and 6(a) of the Commodity Exchange Act ("CEA"), 7 U.S.C. §§ 6(c), 9 and 13(b) (1980 & 1989 Supp.).

Defendants have moved for summary judgment pursuant to Rule 56, Fed.R. Civ.P. on the grounds that (1) Transnor lacks standing to sue under the antitrust laws and the CEA or, alternatively, that the Court should decline to exercise jurisdiction under principles of comity and international law; (2) there is no evidence that defendants conspired to drive down the price of oil in violation of the antitrust laws; (3) Transnor's injury is not cognizable under Section 4 of the Clayton Act, 15 U.S.C. § 15 (1973 & 1990 Supp.) because there is no evidence that defendants' behavior caused oil prices to fall; and (4) defendants' conduct was neither governed by nor in violation of the CEA. For the following reasons, the motion is denied.

## ANTITRUST AND COMMODITY LAW STANDING

■ Defendants first move for summary judgment on the ground that Transnor lacks standing under both the Sherman Act, 15 U.S.C. §§ 1 et seq. and the Commodity Exchange Act, 7 U.S.C. §§ 1 et seq. In an opinion and order dated August 5, 1987 ("Order"), this Court denied defendants' motion to dismiss pursuant to Rule 12, Fed.R.Civ.P. *Transnor (Bermuda) Ltd. v. BP North America Petroleum*, 666 F.Supp. 581 (S.D.N.Y.1987). One of the grounds advanced by defendants for dismissal was that Transnor lacked standing under the antitrust and commodity laws. Accepting the facts alleged by Transnor as true, as a court must on a motion to dismiss, I found that the Brent Oil Market, in which Transnor allegedly suffered its injury, is "primarily a U.S. market," or at least a "part of U.S. commerce." *Id.* at 583. The Court accordingly held that Transnor had standing under U.S. antitrust and commodity laws.

Defendants then moved the Court to certify for immediate appeal the question of "whether Transnor, a foreign corporation which engaged in no business in this country, has standing to sue for injuries allegedly suffered in wholly foreign trading on an international market merely because it is alleged that there are U.S. participants trading in that market as well." The Court denied the motion because the question for certification had misstated the underlying basis for the Court's initial ruling, in which the Court specifically accepted as true Transnor's unrefuted allegation that the Brent Market is a U.S. market and not merely an international market. *Transnor (Bermuda) Ltd. v. BP North America Petroleum*, 677 F.Supp. 777 (S.D.N.Y.1988). The Court thereafter stated that,

[i]f, after conducting pre-trial discovery, defendants uncover evidence indicating that the Brent Market is indeed an international market with no direct impact on

---

**2.** Transnor settled and dismissed with prejudice its claims against Shell International Trading Company ("SITCO") and Shell U.K. Limited ("SUKO"), as well as against BP North American Petroleum and BP Oil International Ltd. (collectively "BP"). Transnor also dismissed with prejudice its claims against the Royal Dutch Petroleum Company, the "Shell" Transport and Trading Company, p.l.c., and the Shell Oil Company.

U.S. commerce, then it may be appropriate for them to move for summary judgment on the ground that plaintiff lacks standing under the antitrust laws. *Id.* at 778. Defendants now move accordingly for summary judgment, insisting that the undisputed facts demonstrate that the Brent Market is an international market and that Transnor, therefore, lacks standing under U.S. antitrust and commodity laws.

■ While U.S. antitrust laws give this Court jurisdiction over antitrust claims that arise from actions directly affecting U.S. commerce, only persons or corporations injured while trading in U.S. foreign or domestic commerce have the standing necessary to bring such claims.[3] In *de Atucha v. Commodity Exchange, Inc.*, 608 F.Supp. 510 (S.D.N.Y.1985), the district court held that foreigners who trade "exclusively" on a foreign exchange do not have standing under either U.S. antitrust or commodity laws. The court noted that "the first prerequisite to a determination that a plaintiff was injured in 'the relevant market' is a finding that the market is part of American foreign or domestic commerce." *Id.* at 518. Because Transnor's claims rest on injury from anticompetitive activity in the Brent Market, the issue presented here is whether the Brent Market is a part of American foreign or domestic commerce or is an exclusively foreign market.

According to Judge Lasker in *de Atucha*, "Congress did not contemplate recovery under the antitrust laws by an individual who traded, and was injured entirely outside of United States commerce." *Id.* at 518. The court further held that "such transactions were not intended to be and are not regulated under the [CEA]." *Id.* at 523. Judge Lasker then found that the plaintiff, having traded on an exclusively foreign market, lacked standing. This case, however, presents a wholly different situation wherein the plaintiff claims that the market on which it traded was a U.S. market or had a direct impact on U.S. commerce, a nexus with the United States sufficient to invoke standing.

■ Because 95% of the trades in the Brent Market are made for speculative or hedging purposes not calling for actual delivery of the oil, the appropriate inquiry involves a consideration of the location of the trading market. The location of the production area and the delivery point are manifestly much less relevant. *See Transnor (Bermuda) Ltd. v. BP North America Petroleum*, 666 F.Supp. 581, 583 (S.D.N.Y. 1987). Where the contracts at issue were made is equally unimportant if the market itself is considered a U.S. market or directly impacts U.S. commerce. *See id.* A plaintiff should not be penalized for the utilization of a foreign branch of a market instead of an equally accessible American branch. As this Court has previously stated, Transnor's choice to purchase the contracts through the London branch, rather than in New York or Houston, "does not lessen Transnor's ability to vindicate Congress's clearly expressed desire that foreigners have standing to sue under the U.S. antitrust laws if the alleged course of anti-competitive conduct has the requisite impact on U.S. commerce." *Transnor*, 666 F.Supp. at 584.

The unrefuted evidence establishes that of the 109 traders and brokers Transnor knew to be active in the Brent Market, 88 had offices located in the United States and at least 6 traded exclusively in the United States. It is further uncontested that two of the three principal trading centers of the Brent Market are located in the United States, specifically, New York and Boston.

Where the market in question has even slight direct ties to U.S. commerce, that market is not an exclusively foreign market and is therefore deemed a U.S. market. While the Brent Market may be a substantially foreign market, Transnor has presented sufficient proof that the Brent Market is not an exclusively foreign market, and thus a U.S. market.

---

**3.** This Court carefully attempts to distinguish those cases dealing with standing from those interpreting subject matter jurisdiction. Defendants clearly contest plaintiff's standing to assert its antitrust and commodity claims.

Moreover, Brent Oil is imported into the United States and it may be delivered to fulfill Light Sweet crude oil contracts traded on the New York Mercantile Exchange. These indirect ties to U.S. commerce further support the determination that Transnor has standing to assert claims arising from trades executed on the Brent Market. Accordingly, the Court concludes that Transnor has standing under U.S. antitrust and commodity laws.

## COMITY AND INTERNATIONAL LAW

■ Defendants next move this Court to stay its hand under principles of comity and international law, claiming that an assertion of jurisdiction by this Court would "affront legitimate and powerful British interests." In evaluating the interests of a foreign government prior to determining whether to assert jurisdiction over a transaction occurring outside the United States, the courts have generally applied a "jurisdictional rule of reason," which seeks to balance the competing interests asserted. The parties agree that the applicable principles of comity among nations is set forth in *Timberlane Lumber Co. v. Bank of America Nat'l Trust & Sav. Ass'n*, 749 F.2d 1378 (9th Cir.1984), *cert. denied*, 472 U.S. 1032, 105 S.Ct. 3514, 87 L.Ed.2d 643 (1985). They disagree, however, on the application of the seven principles espoused by *Timberlane* to the facts at hand. For the following reasons, the Court finds that comity principles do not compel the Court to decline to exercise jurisdiction.

The Court must first determine whether the extraterritorial enforcement of United States antitrust and commodity laws create an actual or potential conflict with the laws and policies of other nations. Defendants assert that the Securities and Investments Board ("SIB")—the British government agency with jurisdiction over United Kingdom ("U.K.") financial markets—has adopted a *Consultive Document on the Future Regulation of the Oil Markets* and an *Oil Market Code of Conduct* in February and March 1988, which presents guidelines for the forward trading of Brent Oil, and that SIB intends to promulgate regulations thereon. Transnor contends that de-

fendants' speculation on the future action of SIB does not create a conflict with foreign law or policy. Transnor also states that no binding regulation of Brent Market trading presently exists in the U.K. The Court agrees with Transnor that application of U.S. antitrust and commodity laws does not create either an actual or potential conflict with existing British government regulation of Brent Market transactions. That a conflict may arise in the future should the British government act is too uncertain to weigh against the exercise of jurisdiction.

Next to be weighed are the headquarters and other office locations of the party corporations, as well as citizenship of persons involved in the alleged illegal conduct. In this case, of the three remaining defendants, Conoco Inc. and Exxon are U.S. corporations, headquartered in the U.S., and Conoco (U.K.) Limited is a subsidiary of Conoco Inc., controlled and directed by its parent. Transnor, a Bermuda corporation, transacted business internationally. Although the relevant transactions were effected through the London branch of the Brent Market, the parties' ties to the United States are stronger than those to the United Kingdom.

Also considered is the extent to which enforcement by either state can be expected to achieve compliance. In this case, compliance with the applicable statutes can be achieved only in the United States because there is no comparable regulation of the Brent Market in the U.K. and defendants offer no evidence that U.S. interests under the pertinent statutes can be vindicated abroad. Therefore, compliance with American law can only be assured in the United States.

The Court next turns to the relative significance of the effects of the alleged illegal conduct on the domestic and foreign commerce of the United States and on commerce elsewhere. Transnor maintains and defendants admit that defendants' trading of Brent Market contracts took place mainly in the United States. It is defendants' alleged conduct in the United States which

gave rise to this action. Because two of the three branches of the Brent Market are in the United States, as mentioned earlier, defendants' alleged conduct has clearly impacted U.S. commerce. This Court recognizes, of course, the equally significant impact on U.K. and international commerce. Consequently, this factor neither favors nor disfavors the exercise of jurisdiction.

The Court must also consider whether defendants' actions were intended to harm or affect American commerce or the foreseeability of such effect. Transnor's complaint alleges that defendants engaged in conduct intended to depress market prices. In its submissions in opposition to the motion for summary judgment, Transnor has sufficiently demonstrated that, at the least, there are issues of fact as to whether defendants intended to affect U.S. commerce or should reasonably have foreseen such an impact. These fact issues preclude summary denial of jurisdiction on the ground of lack of the necessary scienter.

Finally, a court should weigh the location of the alleged illegal conduct in order to assess the appropriateness of the exercise of extraterritorial jurisdiction. Transnor claims that the United States was the center of the illegal conduct charged. While defendants refute the substance of the charges in the complaint, they do not specifically deny that this conduct is alleged to have taken place in the United States. Clearly then, the U.S. is an important locus, if not the hub, of defendants' alleged manipulation.

With all factors considered, both a quantitative and a qualitative tally favor the exercise of jurisdiction by this Court—a result which should not affront British interests.

## ANTITRUST CLAIM

### Standard for Summary Judgment

A party seeking summary judgment must demonstrate that "there is no genuine issue as to any material fact." Fed.R. Civ.P. 56(c); *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 11 (2d Cir.1986), *cert. denied*, 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). It must establish that there is a "genuine issue for trial." *Id.* at 587, 106 S.Ct. at 1356. "In considering the motion, the court's responsibility is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." *Knight*, 804 F.2d at 11.

However, "antitrust law limits the range of permissible inferences from ambiguous evidence in a § 1 case." *Matsushita*, 475 U.S. at 588, 106 S.Ct. at 1356.[4] Specifically, "conduct as consistent with permissible conduct as with [an] illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy." *Id.*; *Monsanto Co. v. Spray–Rite Service Corp.*, 465 U.S. 752, 764, 104 S.Ct. 1464, 1470, 79 L.Ed.2d 775 (1984). There must

---

**4.** Some courts and commentators state that the Supreme Court's decisions in *Matsushita, Celotex*, and *Anderson v. Liberty Lobby, Inc*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) represent a "new era" more favorable to summary judgment motions. *See e.g., Childress, A New Era for Summary Judgments: Recent Shifts at the Supreme Court,* 116 F.R.D. 183 (1987). For example, the *Matsushita* court stated that plaintiffs "must show that the inference of conspiracy is reasonable in light of the competing inferences [of lawful behavior]." *Matsushita*, 475 U.S. at 588, 106 S.Ct. at 1356. This language suggests that courts must more critically weigh the inferences which the parties urge. However, the Second Circuit Court recently emphasized in the context of an antitrust summary judgment motion that, "while some assessment of the evidence is necessary to determine rationally what inferences are reasonable and therefore permissible, it is evident that the question of what weight should be assigned to competing permissible inferences remains within the province of the fact-finder at a trial." *Apex Oil Co. v. Dimauro*, 822 F.2d 246, 253 (2d Cir.), *cert. denied*, 484 U.S. 977, 108 S.Ct. 489, 98 L.Ed.2d 487 (1987).

be direct or circumstantial evidence that "tends to exclude the possibility that the [defendants] were acting independently." *Monsanto,* 465 U.S. at 764, 104 S.Ct. at 1471. Moreover, in antitrust cases, "if the factual context renders [plaintiff's] claim implausible—if the claim is one that simply makes no economic sense—[plaintiff] must come forward with more persuasive evidence to support [its] claim than would otherwise be necessary." *Matsushita,* 475 U.S. at 587, 106 S.Ct. at 1356; *Apex Oil,* 822 F.2d at 253 ("implausibility of a scheme will reduce the range of inferences that may permissibly be drawn from ambiguous evidence").

*Description of Tax Spinning*

■ Transnor claims that defendants carried out their conspiracy through "tax spinning"—the arm's-length sale by an integrated oil producer to a third party and a substantially simultaneous purchase of a similar quantity of oil at substantially the same price for use in that producer's refineries—which, depending on the relation between the average market price and the price at which the trades were made, created the possibility of substantial tax savings under U.K. tax law. The crux of Transnor's claim is that from approximately November 1985 through mid-March 1986, defendants conspired to tax spin Brent Oil at below-market prices in order to reduce the U.K. taxes paid by defendants. Transnor also claims that the artificially reduced price of the spin sales drove down the market price of Brent Oil, a benchmark crude oil, as well as that of other crude oils such as West Texas Intermediate ("WTI"), an oil traded on the New York Mercantile Exchange, with which Brent Oil is virtually interchangeable.

Under the U.K. Oil Taxation Act of 1975 ("Taxation Act"), the applicable petroleum revenue tax rate between April 2, 1985 and March 31, 1986 was 87%. Under the then-applicable provisions of the Taxation Act, the taxed price on sales of oil differed depending on whether the sale was at arm's length on the open market or the oil was transferred directly to an integrated producer's affiliated entity. Transfers to affiliated companies were taxed at an assessed market value, known as the tax reference price ("TRP"), which, beginning in 1984, was determined by the Inland Revenue's Oil Taxation Office ("OTO") based on an average of prices established retrospectively for a period of time prior to the interaffiliate transfer. Defendants argue that because of declining oil prices from other causes, primarily the excess supply in the world oil market caused by OPEC, the TRP was higher than the current market price and thus led to payment of taxes on sales to affiliated entities based on an artificially high rate. Rather than pay taxes based on such an inflated price, defendants entered into matched buy/sell transactions in the open market instead of transferring oil directly to their refineries. Defendants claim that tax spinning thus resulted in payment of taxes based on a more accurate market rate, not, as Transnor claims, at below-market rates. This would furnish a logical explanation of tax spinning if it was done only in a declining market, in which the tax-spin transactions were at an actual market price lower than the TRP—i.e. lower than the average market prices over the past month. Whether the tax spinning was done only in such circumstances is unclear from the present record.

Both parties spend considerable energy debating whether these transfers violate U.K. tax law. In brief, Transnor contends that while it was legal for an integrated oil company to sell its oil in the open market and to buy oil for its own needs, it was not legal to enter into a large number of matched buy/sell contracts at the same price in order to establish a "portfolio" of contracts for delivery months in the future. Defendants held these contracts open until the delivery month and then selected from their "portfolio" the lowest-priced sale and assigned to it oil they produced that month, known as "equity production." Producers were also able to choose among their affiliated businesses in assigning the sale, which was then reported to the tax authorities as the arms-length price at which they sold their equity production. In order to balance its portfolio for the month, other

buy/sells for that month would be disposed of by "booking out"[5] or by entering into an offsetting transaction.

Defendants offer a lengthy explanation for the legality of their behavior and note that after reviewing data concerning all of their Brent transactions during the relevant period, the OTO subsequently approved the portions of Conoco's and Exxon's tax returns that Transnor now challenges. Defendants state that Conoco informed the OTO that when multiple sales and purchases were made in a given delivery month, it reported the lowest-priced transaction as the arms-length sale.[6]

### Economic Incentive to Lower Prices

Defendants argue that they had no financial motive to encourage low, rather than high, crude oil prices and thus Transnor cannot meet its increased burden to defeat summary judgment.[7] Transnor claims that defendants had the following financial incentives to encourage lower crude oil prices. First, defendants are companies, or affiliates of companies, which not only produce and refine crude oil, but also market crude oil and petroleum products made from crude oil. Lower crude prices would allow defendants to obtain higher profit margins in their sales of "downstream" refinery products, more than offsetting losses from sales of lower-priced crude oil.[8] Transnor further claims that because defendants were huge net buyers of crude oil,[9] they stood to gain from lower prices.[10]

Second, defendants would reap significant financial benefits from shifting profits from Brent crude oil production, which was taxed by the United Kingdom at a rate of 87%, to refining and marketing petroleum products, which were taxed at a significantly lower rate of approximately 40%. Under the U.K. tax scheme, a dollar reduction in the price of crude oil led to an after-tax 13-cent loss to defendants on the sale of the oil, whereas defendants' refining affiliates could buy Brent Oil for a dollar per barrel cheaper and, assuming no decline in the price of refined products, increase its after-tax profit by 60 cents per barrel.[11]

5. "Bookout" contracts are separate contracts entered into by the parties to the original contracts whereby they settle their respective obligations under the original contracts by paying each other the difference between the contract price and an agreed reference price.

6. In 1987, the U.K. government changed the tax law to limit a producer's ability to select lower-priced sales from a large portfolio, thus reducing the frequency of tax spinning.

7. In *Matsushita,* the Supreme Court imposed a higher burden on the party opposing summary judgment when the scheme alleged is economically irrational. The *Matsushita* Court found that the predatory pricing scheme alleged—pricing sufficiently below the market level to drive out competitors in order to gain monopoly power and then recoup any resulting losses through monopoly profits—was economically irrational because it led to definite short-term loss and uncertain long-term gain. The instant case involves possible short-term gain and, defendants contend, almost certain long-term loss.

8. Earnings from upstream operations, which include the exploration and production of crude oil, rise and fall directly with crude oil prices. Earnings from downstream operations, which include the refining and marketing of refined products, derive from the difference between the cost of purchasing and refining the crude oil and the market price of the refined products.

9. Conoco claims that when its crude production and refinery runs are compared, it was a net seller of crude oil between January and June of 1986.

10. Defendants contend that Colin Robinson, Transnor's expert witness, wrongly assumed that defendant companies bought lower-priced North Sea crude oil for their refineries in the open market during 1986. Exxon claims that from late 1985 through early 1986, the use of North Sea Crude Oil in Exxon refineries dramatically decreased, and the use of Saudi Arabian oil purchased on a netback basis increased. Moreover, Conoco did not use Brent Oil in its U.K. refinery.

11. Transnor's expert Colin Robinson, Professor of Economics at the University of Surrey, England, opined that defendants' overall after-tax profits would be increased by a drop in crude-oil prices, based on his analysis of the effect of declining oil prices on a "typical" and "sophisticated" integrated producer/refiner of North Sea crude oil, employing data gathered from the trade journal Petroleum Intelligence Weekly. Robinson acknowledges, however, that his data do not reflect "the crude prices paid, the refinery netbacks achieved [nor] ... the tax position of any one company." Robinson Decl. ¶¶ 49–50. Defendants object to Robinson's results as imprecise and lacking probative value because he did not examine data produced in discovery relating to defendants' actual experiences.

As further evidence that defendants had incentives to tax spin to drive down market prices, Transnor points to an Exxon document which calculated "spinning incentive, $/B". Another Exxon document stated that tax spinning "directionally effects downward pressure on market (especially forward months)." Finally, Dr. Edwin Spuller, a Transnor witness, testified that "the majors had, at [the relevant] time, an interest to make their refineries profitable, so they had an interest to damage the crude oil price." Spuller Dep. at 270.

The economic plausibility of the alleged scheme is enhanced by defendants' admission that a decrease in crude oil prices temporarily widens the refining profit margin because of the time lag between the change in crude oil prices and the adjustment in the related refined product markets. An article in Weekly Petroleum Argus states that in the first quarter of 1986, Exxon and Conoco made in the downstream thirty-four and thirteen times more profit, respectively, per barrel of oil than they had made in the previous year. Defendants respond that Exxon and Shell experienced combined upstream and downstream net earnings declines during that same quarter.[12] In addition, they argue that BP's and Conoco's temporary gains were wiped out by the end of the second quarter of 1986, as the depressed price levels of crude oil and narrowed refinery margins resulted in decreased earnings. However, in the 4th quarter of 1985 and the 1st quarter of 1986, the period during which the conspiracy allegedly operated, Exxon and Conoco earned more than they did in the next three quarters combined, when Transnor alleges that tax spinning subsided and crude oil prices recovered.

The parties agree that prices of refined products eventually fall when crude oil prices decline.[13] Defendants claim that they would not act to achieve short-term increases in earnings since any such gain would disappear shortly as product prices adjusted to the lower prices of crude oil, ultimately leading to substantially lower overall earnings. Defendants further argue that even if they were net buyers of crude oil, they had no incentive to drive down the price of crude oil because earnings from upstream operations are the overriding determinant of overall earnings.[14] Defendants therefore maintain that they have a strong incentive to obtain higher prices on their sales of crude oil.

Transnor responds that huge profits stood to be made as long as product prices fell at a slower rate than crude oil prices. Transnor claims that defendants possessed sufficient market power to make product prices "sticky" during a period of price declines.[15] Therefore, defendants had the

12. Transnor argues that Exxon's and Conoco's figures are misleading because they refer to "earnings" or "after tax operating income" rather than "profits." However, these terms are interchangeable, each referring to the excess, if any, of revenues over expenses. Transnor further faults Exxon's figures because they combine natural gas and petroleum earnings; Exxon attempts to justify this by asserting that the bulk of its natural gas production is dissolved in crude oil and it is unable to separate out the two for reporting purposes.

13. Richard J. Kruizenga, Vice President–Corporate Planning for Exxon states that "[c]ompetitive pressures are strong in the downstream and as a result product prices adjust to reflect changes in the price of crude oil." Kruizenga Aff. ¶ 5. A Conoco document prepared in connection with Conoco's 1986 proposed plan stated "the effect of lower crude oil prices is dependent upon how quickly product margins reach a new equilibrium and whether the crude oil price decline precedes that of products or vice versa."

14. Exxon states that between 1976 and 1988, its upstream earnings averaged $3.4 billion and downstream earnings averaged $1.1 billion. During that period, whenever lower crude prices depressed upstream earnings, increases in downstream earnings were never sufficient to compensate for the upstream decreases. In further support of their claims of implausibility, defendants point to their large reserves of oil and natural gas and argue that they could not benefit from a decline in its price.

15. Transnor claims that a high degree of market power enabled integrated companies to keep refinery netbacks high while crude prices were falling. Robinson identifies eight firms, including four other than defendants and their alleged co-conspirator Mobil, as constituting an oligopoly in Western Europe because they accounted for 65% of total product sales in Western Europe in 1984 and 82% of refinery capacity in the British market in 1986. When defendants applied the Herfindahl–Hirshman Index ("HHI"), a measure of market concentration, to firms

economic incentive to lower the prices of crude oil in order to increase their profits in the refined market and their overall earnings.

In its surreply, Transnor argues that information and arguments relating to defendants' incentive to drive world oil prices down are irrelevant because defendants had an incentive to tax spin only on the Brent market and only between late 1985 and early 1986. However, the effect of low Brent prices on other oil prices is pertinent to an examination of defendants' economic incentives to engage in such a scheme. Transnor has acknowledged that "the Brent Market is one of the principal benchmarks of the world price of oil." Transnor's own expert stated that "integrated companies would not have embarked on a tax spinning strategy—which they would have expected to reduce crude prices both in the Brent market and elsewhere—had they not believed that, on balance, they would gain worldwide from that strategy." [16] Robinson Decl. ¶ 70.

Defendants' internal documents during the time period of the alleged conspiracy show no such expectation. For example, on October 31, 1985, Exxon's Corporate Planning Department informed Exxon's Management Committee that a $3 per barrel drop in crude oil prices during 1986–1988 would cause after-tax earnings from operations to decrease between $650 and $700 million per year.[17] Similarly, on February 25, 1986, Exxon's Management Committee was presented with a bar graph charting its outlook for 1986 which illustrated that net income would dramatically decrease if Brent prices continued to fall. On February 10, 1986, Colin Lee, Conoco's then President of Petroleum Operations predicted that "[t]he impact of a 20% drop in crude prices to $20/BBL would reduce our After Tax Operating Income by $99 million or 21% from our 1986 Profit Objective." Lee Aff. ¶ 11. These documents directly contrast Transnor's claim that defendants desired lower crude prices.

However, defendants' arguments that they had no incentive to drive down the market price of Brent Oil, while superficially attractive, miss the real point. Plaintiff does not have to prove that defendants intended to drive down the market price of Brent Oil. It only has to establish that defendants conspired to rig prices in certain transactions for the purpose of understating their income and evading taxes, that this activity had the foreseeable effect of causing prices in general to decline, and that this decline caused economic injury to plaintiff. There was clearly an incentive to tax spin, and defendants do not dispute that there was. There is at least an issue of fact whether plaintiff was in the fall-out area of such activity. The Court therefore concludes that the scheme alleged is sufficiently plausible to avoid placing a higher burden on Transnor under *Matsushita.*

*Antitrust Conspiracy*

Section 1 of the Sherman Act proscribes "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations ..." 15 U.S.C. § 1. A plaintiff must establish only two elements: 1) a conspiracy 2) that unreasonably restrains trade or affects interstate commerce. *Belfiore v. New York Times Co.,* 826 F.2d 177 (2d Cir.1987), *cert.*

---

with Western European refineries, an index of 1028 resulted. Since an HHI range between 1000–1800 represents a moderately concentrated market, *see* U.S. Department of Justice Merger Guidelines at § 3.1, 4 Trade Reg.Rep. (CCH) ¶ 13,103 at 20, 560 (1984), it is unlikely, although possible, that Western European refineries operated as an oligopoly. Robinson concedes that defendants lacked "enough market power to be able to keep refinery netbacks constant whilst crude [oil] prices were being cut." Robinson Decl. ¶ 44.

**16.** Robinson also concedes that such gains could be recognized only if these companies could delay the decline of product prices in the other markets as well. Transnor has provided no evidence that defendants possessed sufficient market power to delay the decline of product prices worldwide.

**17.** Although the document does not state whether this $3.00 per barrel decrease refers to oil prices generally or only Brent prices, it appears from subsequent documents that this figure refers to Brent prices.

*denied*, 484 U.S. 1067, 108 S.Ct. 1030, 98 L.Ed.2d 994 (1988).

■ Transnor must be able to prove that defendants had a "unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement." *International Distrib. Centers Inc. v. Walsh Trucking Co.*, 812 F.2d 786, 793 (2d Cir.), *cert. denied*, 482 U.S. 915, 107 S.Ct. 3188, 96 L.Ed.2d 676 (1987) (quoting *American Tobacco v. United States*, 328 U.S. 781, 810, 66 S.Ct. 1125, 1139, 90 L.Ed. 1575 (1946). Transnor has submitted no direct evidence of a conspiracy, but proof of such an agreement may be established by circumstantial evidence which permits a rational inference that defendants conspired to rig prices in Brent Oil transactions. *See Interstate Circuit, Inc. v. United States*, 306 U.S. 208, 59 S.Ct. 467, 83 L.Ed. 610 (1939); *cf. In re Plywood Antitrust Litigation*, 655 F.2d 627, 633 (5th Cir.1981), *cert. dismissed*, 462 U.S. 1125, 103 S.Ct. 3100, 77 L.Ed.2d 1358 (1983) ("solemnized covenants to conspire are difficult to come by ...").

■ As previously discussed, in determining whether such circumstantial evidence exists, a court must keep in mind the distinction between independent but parallel business actions [18] and a "conscious commitment to a common scheme designed to achieve an unlawful objective" which excludes the possibility of independent action. *Monsanto Co.*, 465 U.S. at 768, 104 S.Ct. at 1473. Only the latter is prohibited by the antitrust laws. Conduct equally consistent with permissible business activity as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy. *Matsushita*, 475 U.S. at 588, 106 S.Ct. at 1356. According to the Second Circuit Court of Appeals:

a plaintiff must show the existence of additional circumstances, often referred to as 'plus' factors, which, when viewed in conjunction with the parallel acts, can serve to allow a fact-finder to infer a conspiracy,

*Apex Oil Co. v. Dimauro*, 822 F.2d 246, 253–54 (2d Cir.), *cert. denied*, 484 U.S. 977, 108 S.Ct. 489, 98 L.Ed.2d 487 (1987). These plus factors should not be considered in isolation; the important determination is whether the evidence viewed as a whole supports a reasonable inference of conspiracy. *Id.* at 254–55. Because each defendant had an independent incentive to engage in tax spinning in order to minimize the amount of tax paid on their crude oil under the U.K. tax system,[19] these "plus" factors assume extreme importance. This Court finds that the following factors, considered together, support a reasonable inference of conspiracy.

*Circular and other Transactions*

Between November 27, 1985 and February 4, 1986, defendants Exxon, BP, Shell, Conoco and alleged co-conspirator Mobil were parties to at least 16 circular sales [20] whereby the identical amount, grade and delivery date of oil was traded among them on the same day at the same price. Transnor argues that it is unlikely that independent business reasons caused these defendants to trade exactly the same quality, amount and grade of oil on the same day among themselves. Transnor argues that these transactions tend to exclude the possibility that the defendants were acting independently, especially considering that they occurred at identical prices when Brent prices can fluctuate over wide ranges in the course of a day.

These transactions are certainly unusual in that the only parties who entered into them were certain defendants and Mobil. Defendants argue that Transnor lacks any documentary records establishing prear-

---

**18.** Defendants argue that there was little "commonality of conduct" among them as each producer adopted different rules for tax spinning and engaged in spinning for different motives. Nonetheless, defendants' conduct shared important common features in that each defendant entered into significant numbers of matched buy/sell transactions for tax purposes.

**19.** Transnor's own experts admit that it was not necessary for defendants to collude in order to benefit individually from tax spinning. Spuller Dep. at 290, 308, 337; Robinson Dep. at 174.

**20.** Except for one four-way transaction, these transactions involved three parties and the original selling party ended up with exactly what it had sold.

rangement and cannot rely solely on the fact that these transactions occurred. However, since all the parties acknowledge that many Brent transactions are arranged over the telephone, the absence of such records is not critical. In any event, the striking similarities among these transactions strongly supports an inference that there was some form of coordination among the parties thereto. The inference of coordination is strengthened by the fact that defendants Exxon and Conoco were able to enter into 87 and 69 buy/sells, respectively, at identical prices during a volatile period in the Brent market.

### Disappearance of Evidence

"The nonproduction of material evidence in the control of a party raises an inference that evidence is unfavorable to that party." *Tupman Thurlow Co. v. S.S. Cap Castillo*, 490 F.2d 302, 308 (2d Cir.1974); *see also INA Aviation Corp. v. United States*, 468 F.Supp. 695 (E.D.N.Y.1979), *aff'd*, 610 F.2d 806 (2d Cir.1979). Transnor argues that Exxon's failure to produce the notebook of Diane Sharp, the Exxon trader responsible for the Conoco and Mobil accounts, covering the period from October 1985 to July 1986 presents an additional "plus" factor. A trader's notebooks generally contain a detailed chronological record of the trader's dealings. Sharp's notebook is clearly material as it involves the time period of the alleged conspiracy and likely contained information relating to the circular transactions with Conoco and Mobil. Pursuant to Transnor's document requests, Exxon produced all their traders' notebooks, except Sharp's notebook covering the aforementioned period. Sharp testified that the notebook existed and was in Exxon's control when she left Exxon's employ in July 1986, several months after Transnor served its document production request.

■ An inference that the missing evidence is harmful can be rebutted by an adequate explanation of the reason for nonproduction. *Tupman Thurlow*, 490 F.2d at 308. Exxon claims that the notebook was inadvertently lost when Sharp left the

company during a massive reduction in work-force. There is merit in defendants' argument that Transnor's failure to identify any evidence of collusion from Conoco's traders' notebooks or to attempt to obtain Mobil's traders' notebooks weakens the suspicion that Sharp's notebook might be a "smoking gun."

Therefore, considered alone, the absence of this notebook clearly could not support an inference of conspiracy. However, it is an additional element which must be considered as part of the whole. *See Apex*, 822 F.2d at 254–55.

### Internal Documents

Transnor points to a number of internal documents which it believes contain evidence of a coordinated strategy among defendants to rig prices in the tax-spin transactions. A November 1, 1985 memorandum written by Exxon employee E.H. Gassenheimer discussed the tax-spinning strategies of Exxon, Conoco, Shell and BP. Transnor suggests this memorandum is based on information conveyed to Exxon by the other named companies rather than information gleaned from independent research or analysis. Examination of the memorandum, however, reveals statements such as "[Shell] is believed to be trading only one or two months ahead." Further, the memorandum explicitly states that it is based on "market information." If the memorandum were based on information conveyed by the alleged co-conspirators, it would not have been necessary for the author to speculate as to what the other producers were doing. Furthermore, the author's failure to mention the strategies of other integrated producers, a failure which Transnor deems suspicious, may logically be attributable to the author's view that the other producers were not engaged in tax spinning.[21]

Transnor next points to an Exxon "commercial telecon" dated November 11, 1985, which states in relevant part: "[Esso Petroleum Company] later reported that Shell have 44 BSM [Brent System] buy/sells in

---

**21.** Another Exxon document relied on by Transnor discusses the tax spinning strategies of Shell and BP, making statements such as "believe BP is selling equity; buying cheapest alternative."

place for Dec of which only 13 can be spins." Defendants respond that the number of buy/sells entered into in a given month was available from other market participants, such as brokers. Defendants also claim that it is obvious that only 13 Shell trades for a given month could have been spins because Shell was entitled to lift only 13 Brent equity cargoes a month. This telecon is therefore not strong evidence that the information was provided by Shell, since it could have been provided by other market participants as well.

Another Exxon "commercial telecon" dated January 21, 1986 states "1 equity cargo has been nom. out to BP. Next one will be 8th Feb cargo to Conoco. Signalled continue Feb spinning." The document does not indicate whether the individuals or entities signalled were, as Transnor contends, defendants BP and Conoco or Exxon's own traders. While this document provides support for the fact that defendants' engaged in tax-spinning transactions, which defendants do not dispute, standing alone it is too ambiguous to support an inference that defendants signalled to one another, and thereby conspired, to collude in tax spinning.

After careful consideration of the evidence presented, this Court finds that Transnor has sufficiently met its burden under *Matsushita* to survive defendants' summary judgment motion. The evidence submitted, when viewed as a whole, could permit the trier of the facts to draw a reasonable conclusion that the actions of the defendants were not independent but the product of a conspiracy to engage in joint conduct which had the foreseeable effect of lowering the price of Brent Oil.

### Causation

■ A plaintiff must prove that its business injury was caused by defendants' violation of the antitrust laws in order to recover damages under the Clayton Act.[22] *See Argus, Inc. v. Eastman Kodak Co.,* 801 F.2d 38, 41 (2d Cir.1986), *cert. denied,* 479 U.S. 1088, 107 S.Ct. 1295, 94 L.Ed.2d 151 (1987). Of course, "mere conjecture or speculation by the party resisting summary judgment does not provide a basis upon which to deny [a summary judgment] motion." *Id.* at 42 (quoting *Quarles v. General Motors Corp.,* 758 F.2d 839, 840 (2d Cir.1985). Defendants argue that Transnor cannot establish a causal connection between its injury and the alleged antitrust violation. In order to avoid summary judgment, Transnor must be able to provide material facts to support its claim that the 1986 price decline was caused by defendants' tax spinning rather than by other causes.

The Court must first consider whether defendants actually traded at below-market prices.[23] This requires a basic understanding of the two major ways in which Brent cargoes were traded.[24] "Dated Brent" refers to cargoes which were sold for delivery at a specific date and "15–Day Brent" refers to cargoes which were sold for delivery during a specific forward month, on 15 days notice to the buyer of the date on which the cargo should be

22. Section 4 of the Clayton Act, 15 U.S.C. § 15 (1976) provides that, "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor ... and shall recover threefold the damages by him sustained."

23. Defendants maintain that "Transnor's case depends on its ability to prove as *fact* that defendants traded at below-market." Defendants' Reply Brief at 2. Since a violation of section 1 of the Sherman Act occurs when there is even an unconsummated agreement in restraint of trade, *see American Tobacco Co. v. United States,* 328 U.S. 781, 789, 66 S.Ct. 1125, 1129, 90 L.Ed. 1575 (1946); *United States v. Socony–Vacuum Oil Co.,* 310 U.S. 150, 225 n. 59, 60 S.Ct. 811, 845 n. 59, 84 L.Ed. 1129 (1940), the

Court will address the issue of causation in those terms.

24. The parties have agreed to enter into a stipulation as to the terms of Exxon's, Conoco's, SUKO's and SITCO's contracts for the purchase and sale of crude oil, and have agreed, where supported by documentary evidence, on the contract's date of entry, price, grade, and month of delivery. No agreement has yet been reached with respect to BP contracts. The prices, dates and delivery months of non-defendant transactions were derived from Petroleum Argus Ltd. ("Argus"), a London-based spot market crude oil reporting service which gathers its information directly from market participants, which the parties have agreed to stipulate are accurate.

lifted. Brent was sold for delivery both in the current month and for delivery up to five months in the future. In the Brent market, prices vary depending on the date the oil will be delivered and the market participants' expectations as to how future events will affect prices. Thus, dated and undated Brent contracts essentially involve two different markets. *See* Sas, "The Legal Aspects of the 15 Day Brent Market (Part I)," *5 Journal of Energy and Natural Resources Law* 109, 111 (1987) ("[a]lthough dated and 15–day Brent involve the same commodity, the purposes and methods of trading each are sufficiently different to justify regarding them as two distinct (albeit interrelated) markets."). According to defendants, the 1986 decline in prices for forward Brent cargoes resulted from the expectation of participants in the Brent market that future Brent prices would decline.

Transnor defines "below-market prices" as (1) prices lower than those at which the Brent market was previously trading before defendants undercut it or (2) prices below the average price of non-defendants' trades for the same period. Plaintiff's Opposition Brief at 41. Defendants first respond that Transnor cannot support its claim that defendants' prices were below the average of nondefendants' trading prices. This is unclear. Colin Darracott, a former trader for the British National Oil Corporation, analyzed trading records for Transnor, and concluded that defendants traded Brent Oil at an average of 66 cents per barrel below the remainder of the market between November 25, 1985 and February 7, 1986. At first glance, this appears to support Transnor's theory of below-market prices. However, by comparing the range of prices which occur on any given trading day, Darracott's calculations fail to take into account that 1) the price of Brent Oil varies depending on the delivery month; 2) as prices declined, they were lower for more remote months than for near months; and 3) the volume of trading done near the beginning of the price decline and near the

end differed. Thus, it is doubtful whether these calculations support a conclusion of below-market trading.

Darracott also compared average prices for defendants and nondefendants for a given day and delivery month and found that in the 127 direct comparisons, defendants' average prices were below nondefendants' average prices 57% percent of the time and equal to or above non-defendants' average prices 43% percent of the time. However, as defendants point out, this analysis fails to take into consideration the amount by which these averages differed or whether defendants' trades were within the range of those of non-defendants.

Defendants' expert Franklin Fisher, Professor of Economics at the Massachusetts Institute of Technology, compared trades to which defendants, and Mobil, were parties to trades where no defendant was a party and concluded that defendants did not engage in belowmarket trading. Only some of his conclusions will be summarized here. Like Darracott's second set of calculations, Fisher compared the transaction prices of defendants and nondefendants on a given day and delivery month. Between the period of November 26, 1985 and March 31, 1986, the period of the steepest price decline, defendants' average transaction prices averaged 1.2 cents below non-defendants' average transaction prices, a difference statistically indistinguishable from zero.[25] At the time, the average spread between the day's high and low prices for non-defendants was 35.7 cents per barrel. Of the 86 trading days in this period, there were twenty days in which defendants' average price was below the non-defendants' average price for all months traded for which comparisons were possible, and twenty-two days in which defendants' average prices were at or above non-defendants' prices for all months traded.

After careful review of the calculations presented by the parties, this Court concludes that there are simply no material facts showing that defendants' trades were

---

**25.** Transnor does not contradict this conclusion. When Fisher performed the same calculations using the same time period as Darracott's calculations, defendants were found to have traded an average of 0.96 cents *above* non-defendants.

below the average prices of non-defendants' trades. However, Transnor explains the lack of statistical difference between defendants' and non-defendants' prices as demonstrating the devastating success of defendants' tax-spinning scheme, which so influenced the market that all trades were conducted at lower prices. Thus, Transnor essentially contends that "below-market prices" should be defined as prices below what the market prices would be in the absence of tax spinning. However, Transnor must still prove that defendants caused prices to fall; the mere fact that prices declined is obviously insufficient to support a conclusion that defendants caused the price decline.

Transnor asserts that defendants' volume of low-priced taxspin transactions led other traders to assume there was a downward price trend and to decrease their prices accordingly, creating a downward price spiral. Transnor argues that other market participants, not knowing the reasons for the lower-priced transactions,[26] followed the lead of the major oil companies. As previously described, oil producers were either taxed at the price in an arms-length sale or, in the case of an interaffiliate transfer, upon the TRP—the market average for the 30 days prior thereto. Defendants could save taxes by tax-spinning only when the tax-spin price was less than the TRP. Transnor claims defendants colluded to set prices for their tax spins below the TRP in order to achieve tax savings. Exxon trader Jay Wald confirmed that tax spinning was utilized only when the spin price was lower than the expected TRP. Defendants answer that although the tax-spin price was below the expected TRP when the market was in decline, it was not below the market price. Transnor responds that the tax-spin prices were not a response to a declining market, but its cause. This cause-effect conundrum is an issue for the jury to decide.

While Transnor does not present evidence that defendants traded at low prices earlier in the day to set off a chain reaction of lower prices, this does not, as defendants contend, invalidate Transnor's claim that defendants undercut the market. This Court fails to discern why defendants could not, for example, trade at low prices in the middle of the day with the result that those low trades would affect prices later in the same day or over the course of several days.

Defendants also argue that their reported trades did not influence the market. For example, with reference to the sixteen days on which defendants' low prices were below the low prices of non-defendants for all months traded, where comparisons are possible, prices declined on four of the days and increased on seven. On the day after each of the sixteen days, prices declined on seven days but not on the other nine. While these examples show no predictable corollation between defendants' low-priced trades and prices on the same or next day, this does not conclusively establish that other market participants were not affected by defendants' low-priced trades.

While defendants emphatically deny that their tax spinning caused prices to decline, the view that tax spinning contributed to lower prices was expressed in an internal Exxon document which stated that tax spinning "directionally effects downward pressure on market (especially forward months)." However, the document also stated that "crude surplus judged to be by far the major factor influencing current market drop." A report on an Oxford North Sea Study sponsored by, among others, Shell and Exxon, also contained a hypothesis that a higher volume of tax spinning has a downward price bias. On September 8, 1986, Argus stated, "[t]he impetus to the fall in prices in the first quarter of this year was provided by vigorous tax spinning, as companies attempted to minimize their tax exposure." Transnor's

**26.** Transnor provides evidence that other market participants were unaware of the extent of tax spinning. For example, Exxon trader Sharp testified that non-participants in the tax spin did not know whether a given transaction was a tax spin or not. This was confirmed by Morgan Stanley trader Nancy Kropp, who stated that she could not tell what percentage of Exxon's or Conoco's trades were tax spins.

Supp. Exh. 3. Transnor thus provides documentary evidence that tax spinning was believed to depress prices.

Defendants argue that the Brent Oil price decline was instead caused by a worldwide oversupply of crude oil, attributable to the policies and actions of Saudi Arabia and OPEC. In 1983, OPEC agreed to oil production quotas and Saudi Arabia agreed to serve as the "swing producer" and adjust its production to absorb movements above and below the expected demand for OPEC's output. By September 1985, this agreement had failed and Saudi Arabia began to increase its output and to offer customers a "netback contract" whereby the crude oil price was determined by the spot price of the refined product less transport and processing cost and a profit margin for the buyer. In response, other OPEC countries also increased their output. At a meeting in December 1985, OPEC shifted its official policy from production quotas to increasing OPEC market share. Defendants argue that as oil from earlier netback sales arrived in markets, product prices decreased and led to reduced crude oil prices. The oversupply of OPEC crude also displaced Brent as a feedstock for European refineries, forcing Brent Oil producers to sell Brent Oil at lower prices in other markets.[27]

A material issue of fact whether supply exceeded consumption, is created by the view of Transnor's expert Robinson that world consumption exceeded supply in the first quarter of 1986 when the consumption of non-industrialized countries is taken into account. Furthermore, Robinson contends that by early January 1986, the market had adjusted to the impact of changes in Saudi policy and the OPEC meeting and even if the $5.00 per barrel decline in oil prices between late November 1985 and January 9, 1986 were attributed to OPEC and the Saudis, the further $15.00 per barrel drop is attributable only to tax spinning.[28] In a paper given at an energy seminar in September 1986, President of former defendant SITCO Sylvan Robinson, stated that "netback deals ... have not created automatic downward pressures." Although his paper did not attribute the decline in Brent prices to tax spinning, it supports Transnor's theory to the extent that OPEC's actions did not cause the price declines in question.

From the evidence provided, there are material questions of fact whether tax spinning, OPEC actions or some combination of the two caused prices to decline on the Brent market. Of course, plaintiff must be able to segregate damages caused by defendants' illegal behavior from damages caused by other factors. *See e.g., Southern Pac. Com. Co. v. American Tel. & Tel. Co.*, 556 F.Supp. 825 (D.D.C.1982), *aff'd*, 740 F.2d 980, 740 F.2d 1011 (D.C.Cir. 1984), *cert. denied*, 470 U.S. 1005, 105 S.Ct. 1359, 84 L.Ed.2d 380 (1985). While defendants vigorously contend that Robinson's estimates as to the extent of the price decline caused by tax spinning is mere speculation, it is the jury's task, not the Court's, to weigh Robinson's theory that the market had already adjusted to OPEC's actions and that the price decline which forced Transnor's defaults was caused by tax spinning. These issues of material facts preclude summary judgment.

---

**27.** Defendants note that market analysts and commentators in late 1985 and early 1986 overwhelmingly attributed the price decline to OPEC. One piece of evidence which defendants provide is a January 1986 telex written by E. Roy Moor, a principal of Transnor, in which he stated that Transnor had "become increasingly concerned about the price distortions created in the crude oil markets by the impact of refined product netback related crude oil and in particular the effects of increased Saudi Arabia crude oil production/netback sales." Moor Exh. 81.

**28.** In Robinson's deposition, taken before he submitted these calculations, he testified that he was "not sure" how to make these calculations and had seen no literature which explained the principles to apply. Robinson Dep. 258–59. Although Robinson claims that the market had fully adjusted to OPEC policy by January 1986, he also attributes a $2.00 per barrel price drop to reaction to a March 1986 OPEC meeting. Thus, it appears that, contrary to his earlier statements, Robinson claims that tax spinning accounted for a $13.00, not a $15.00, drop in price per barrel.

## APPLICABILITY OF THE CEA

■ Next, defendants challenge the Court's subject matter jurisdiction over the commodities claims, contending that the Brent transactions were "cash forward contracts" specifically exempted from the scope of the CEA. While section 2(a)(1) of the CEA provides the Commission with regulatory jurisdiction over "contracts of sale of a commodity for future delivery," [29] it further provides that the term future delivery "shall not include any sale of a cash commodity for deferred shipment or delivery." [30] This case presents the Court with a novel type of transaction, which appears to be a hybrid of a futures contract and a forward contract.[31] Examination of the distinctions between the two, their purposes and the caselaw construing them, leads the Court to conclude that Transnor's 15–day Brent transactions are futures contracts within the meaning of the Act, and are therefore subject to the Commission's regulatory powers.

Sales of cash commodities for deferred shipment or delivery generally have been recognized to be transactions in physical commodities in which delivery in fact occurs but is delayed or deferred for purposes of convenience or necessity. See *Commodity Futures Trading Comm. v. Co Petro Marketing Group, Inc.*, 680 F.2d 573 (9th Cir.1982); *In re Stovall*, [1977–1980 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 20,941, 23,777 (CFTC 1979); 52 Fed.Reg. 47022 ("Regulation of Hybrid and Related Instruments: Advance Notice of Proposed Rulemaking") (CFTC, December 11, 1987). Forward contracts have thus been defined as transactions in which the commercial parties intend and can accommodate physical transfer of the actual commodity. See *Co Petro*, 680 F.2d at 578–79;

*NRT Metals, Inc. v. Manhattan Metals (Non–Ferrous), Ltd.*, 576 F.Supp. 1046, 1050–51 (S.D.N.Y.1983). By contrast, futures contracts are undertaken primarily to assume or shift price risk without transferring the underlying commodity. As a result, futures contracts providing for delivery may be satisfied either by delivery or offset. See 54 Fed.Reg. 30694, 30695 ("Policy Statement Concerning Swap Transactions") (CFTC, July 21, 1989). Once distinguished by unique features, futures and forward contracts have begun to share certain characteristics due to increasingly complex and dynamic commercial realities. The predominant distinction between the two remains the intention of the parties and the overall effect of the transaction.

The Commodity Futures Trading Commission ("CFTC") has recognized that commodity transactions between commercial participants in certain markets have evolved from privately negotiated contracts for deferred delivery of a physical commodity under which delivery generally occurs to transactions that have highly standardized terms and are frequently satisfied by payments based upon intervening market price changes. See Regulation of Hybrid and Related Instruments: Advance Notice of Proposed Rulemaking, *supra* at 47027. 15–day Brent is such a market. The 15–day Brent market involves sales or purchases of a cargo for delivery on an unspecified day of a given month. The actual delivery dates are determined at the seller's option, the buyer being entitled to clear notice of a three-day loading range. 15–day Brent sales are therefore highly specialized forward sales which start out

---

29. "Contracts of sale" is defined as "sales, agreements of sale, and agreements to sell." 7 U.S.C. § 2 (1976). "Commodity" is broadly defined to include, among others, "all other goods and articles ..., and all services, rights, and interests in which contracts for future delivery presently or in the future dealt in." *Id.* Defendants do not contest that the Brent transactions were contracts of sale of commodities as defined by section 2(a)(1) of the Act.

30. Cash commodity contracts for deferred shipment or delivery are commonly known as "cash forward contracts," whereas contracts of sale of a commodity for future delivery are called "futures contracts." See H.R.Rep. No. 93–975, 93rd Cong., 2d Sess. 129–30 (1974).

31. The Commission intends to adopt regulations concerning the scope of the forward contract's jurisdictional exclusion in a future release. 54 Fed.Reg. 1128, 1130 n. 14 ("Proposed Rules Con-

"dry"[32] but ultimately become "wet,"[33] subject to liquidation of the contract. *See* The Legal Aspects of the 15–Day Brent Market, *supra,* at 110. Because the contracts do not provide for offset without the consent of the parties and because the sellers cannot predict in advance whether a particular buyer will insist on physical delivery, the market remains one based on physical trading. *Id.* at 116. Yet, because 15–day Brent oil can be sold without physical cover initially, participants can take long or short positions in the market for purposes of hedging and speculation, explaining the high ratio between barrels traded and barrels delivered. The three major motivations in Brent market activity, hedging, speculation and tax spinning, *id.;* R. Bacon, The Brent Market: An Analysis of Recent Developments, WPM8, Oxford Institute for Energy Studies (1986), have led at least one commentator to describe the market as an "unregulated and unguaranteed form of futures trading." The Legal Aspects of the 15–Day Brent Market, *supra,* at 117 (quoting International Petroleum Exchange of London: "Brent Crude Oil, Trading of Brent Crude. Notes for Discussion," February 26, 1986). The 15–day Brent Market has thus assumed aspects of the futures market while retaining elements of the forward contract.

*Forward Contracts*

The legislative history of the forward contract exclusion, fully set forth by the Ninth Circuit Court in *Commodity Fu-*

*tures Trading Comm. v. Co Petro Marketing Group, Inc.,* 680 F.2d 573 (9th Cir. 1982), reveals its narrow purpose: to facilitate commodities transactions within the commercial supply chain. Policy Statement Concerning Swap Transactions, *supra,* at 30695. The exemption originated in the 1921 Act to meet the particular need of a farmer to sell part of next season's harvest at a set price to a grain elevator or miller. *See* S.Rep. No. 212, 67th Cong. 1st Sess. 1 (1921), H.R.Rep. No. 345, 67th Cong. 1st Sess. 7 (1921). The exemption was predicated upon the contemplation of actual, albeit future, delivery of the underlying commodity.[34] *Co Petro,* 680 F.2d at 578; *NRT Metals, Inc. v. Manhattan Metals (Non–Ferrous), Ltd.,* 576 F.Supp. 1046, 1050 (S.D.N.Y.1983). The more recent 1974 version of the Act has left unchanged the exemption's limited scope, confirming the view that a forward contract is one in which the parties contemplate the future transfer of the commodity. *See Co Petro,* 680 F.2d at 578 (citing H.R.Rep. No. 975, 93rd Cong.2d Sess. 129–30 (1974)); *NRT Metals,* 576 F.Supp. at 1050.[35] "[N]othing in the legislative history surrounding . . . [the exemption] suggest[s] that Congress intended to encompass agreements for the future delivery of commodities sold . . . for . . . speculative purposes." *Co Petro,* 680 F.2d at 579. The *Co Petro* Court summed up that,

> this exclusion is unavailable to contracts for sale for commodities which are sold

cerning Regulation of Hybrid Instruments") (CFTC January 11, 1989).

**32.** A "dry" or "paper" deal refers to the purchase or sale of a claim on a cargo of Brent in some future month.

**33.** A "wet" deal refers to a physical transaction in which a specific cargo actually changes hands.

**34.** During the hearings prior to enactment of the CEA's predecessor, the Future Trading Act, which sought to bring federal control to Futures trading, witnesses expressed concern that there were a variety of legitimate off-exchange commercial transactions, such as cash grain contracts between farmers and grain elevator operators for the future delivery of grain, in which delivery of the commodity was delayed. Then–Secretary of Agriculture Henry Wallace urged preservation of the right to buy or sell next

season's crop which had not yet been planted or harvested but which would exist at the delayed delivery date. 1921 Senate Hearings at 462. Senator Capper, the sponsor of the Senate version of the bill, also stated that the bill dealt only with transactions in which the transfer of actual grain was not contemplated and that the entire business of sales or purchases of actual grain, either for present or future delivery, is expressly excluded from coverage. 61 Cong. Rec. 4762, 67th Cong., 1st Sess. (Aug. 9, 1921); *Co Petro,* 680 F.2d at 578.

**35.** A House Report on the recent amendments focused on the "inherent value" of the commodity to the buyer because of the nature of his business in reselling, distributing, manufacturing or otherwise dealing with the underlying commodity. *See Co Petro,* 680 F.2d at 578.

merely for speculative purposes and which are not predicated upon the expectation that delivery of the actual commodity by the seller to the original contracting buyer will occur in the future. *Id.; see NRT Metals*, 576 F.Supp. at 1051.

In determining whether a particular transaction is exempt from the Act's jurisdiction as a forward contract, the Courts and the CFTC have required that the contract's terms and the parties' practice under the contract make certain that both parties to the contract deal in and contemplate future delivery of the commodity. *See Co Petro*, 680 F.2d at 578; 50 Fed.Reg. 39656, 39657–58 ("Characteristics Distinguishing Cash and Forward Contracts and 'Trade' Options") (CFTC, September 30, 1985).

In *Co Petro*, the relevant agency agreements in gasoline obligated Co Petro to perform an offsetting service for its customers which would satisfy their contractual duties without delivery. Co Petro customers could also liquidate their positions in the face of adverse price fluctuations through a cash settlement by cancelling their contracts and paying only the liquidated damages provided for in the agreements. The Ninth Circuit Court likened Co Petro's customers to those customers who trade on organized futures markets because they could deal in commodities futures without the forced burden of actual delivery, *Co Petro*, 680 F.2d at 570, 580, and accordingly held that "the contracts here represent speculative ventures in commodities which were marketed to those for whom delivery was not an expectation." *Id.* at 581.

In *Commodity Futures Trading Comm. v. Comercial Petrolera Internacional S.A.*, [1980–82 Transfer Binder] Comm.Fut. L.Rep. (CCH) ¶ 21,222 at 25,088 (S.D.N.Y. 1981), Judge Knapp similarly held that the relevant oil contracts were intended as "investment vehicles" in which the parties had never anticipated delivery. *Id.* at 25,098. The court's reasoning emphasized the language in the contracts that obligated the buyers to "purchase a specified amount of oil at a fixed price *or* to notify the dealer to sell the oil at the going price on or before a specified future date." *Id.* at 25,092–93.

In *Habas v. American Board of Trade*, [1986–87 Transfer Binder] Comm.Fut.L. Rep. (CCH) ¶ 23,500 at 33,320 (CFTC 1987), the Judgment Officer, viewing the transactions as a whole to be futures contracts, noted that "the company's literature implies the opportunity to offset and the company permits entering into an opposite offsetting transaction prior to the maturity of the contract, both of which are characteristic of a futures contract." The Judgment Officer further considered the transactions' standardized terms as a means of facilitating offsetting transactions. *Id.* at 33,321.

In determining whether the parties to copper contracts intended delivery of the commodity, Judge Carter in *NRT Metals, Inc. v. Manhattan Metals (Non–Ferrous), Ltd.*, 576 F.Supp. 1046, 1050 (S.D.N.Y. 1983), focused on whether the parties maintained facilities to accomodate physical delivery of the 500 metric tons of copper and whether the parties simultaneously bought and sold copper futures contracts. The district court concluded that both factors contraindicated any intention of actual delivery. *Id.* at 1051.

In the present case, defendants have acknowledged the tax advantages of trading in 15–day Brent and do not dispute that during the relevant period, 15–day Brent oil contracts were routinely settled by means other than delivery, most typically through the clearing techniques of offset and bookout. However, defendants maintain that because the contracts lack a contractual right to avoid delivery, they are predicated upon actual delivery of the oil and thus constitute forward contracts within the Act's definition. The Court disagrees. The high levels of speculation and performance without delivery, as well as the relatively standardized contracts, distinguish the 15–day Brent transactions from the forward contracts contemplated by the drafters of the Act.

■ The Court acknowledges that 15–day Brent contracts may represent binding commitments to buy or sell physical oil. The real question, however, is whether the

transactions are more like bargains for the purchase and sale of crude oil than speculative transactions tacitly expected to end by means other than delivery. The Ninth Circuit Court's "forced burden of delivery" language in *Co Petro* does not mandate forward contract classification of those contracts imposing a forced burden which is not expected to be enforced. The Ninth Circuit Court held only that the *absence* of a forced burden of delivery is indicative of the speculative nature of futures contracts. That court did not have before it contracts imposing a forced burden of delivery, and thus did not rule on the effect of the *presence* of such a burden. Accordingly, this Court need not disagree with or deviate from *Co Petro*, but merely considers as relevant whether the contracts provide for an opportunity to avoid delivery. This is consistent with the reasoning of the *Habas* court, which speaks in terms of "opportunity to offset." This Court concludes that even where there is no "right" of offset, the "opportunity" to offset and a tacit expectation and common practice of offsetting suffices to deem the transaction a futures contract.

Defendants admit that the incentive to spin and respin was to ensure that taxes were paid on the basis of a more favorable market price. Defendants' 328 tax spin transactions reveal that the underlying purpose was not to transfer physical supplies of oil. Defendants' expert, Donald Miller, states in his Affidavit that,

> Many participants in the Brent Market have no intention of taking delivery of oil either to store or refine it and others who sell Brent do not produce it.

Miller Aff. ¶ 16. Indeed, "only a minority of transactions in the Brent market result in delivery." *Securities and Investments Board, Consultative Document on the Future Regulation of the Oil Markets* at 2 (February 1988). The customary use of offsetting and booking out strongly suggests that physical delivery was not contemplated by the parties.

Moreover, the high degree of standardization of terms such as quantity, grade, delivery terms, currency of payment and unit of measure, which facilitate offset, bookout and other clearing techniques available on the Brent market, further evidence the investment purpose of Brent trading. The 15–day Brent market does not remotely resemble the commercial trading originally excepted from the Act. While this Court recognizes that commercial transactions have increased in complexity since the predecessor to the CEA was enacted, the interests of Brent participants, which include investment and brokerage houses, do not parallel those of the farmer who sold grain or the elevator operator who bought it for deferred delivery, so that each could benefit from a guaranteed price.[36]

While there is no contractual entitlement to satisfy Brent obligations by means other than delivery, the likelihood of avoiding delivery has enabled participants to develop what is essentially a "paper" market for speculative or hedging purposes rather than one for physical transfer. The Court therefore concludes that the 15–day Brent transactions do not constitute forward contracts excepted from the CEA.

*Futures Contracts*

After deciding that the relevant contracts were not forward contracts, the *Co Petro* court considered whether the contracts constituted futures contracts. In making that determination, the court found that,

> no bright line definition or list of characterizing elements is determinative. The transaction must be viewed as a whole with a critical eye toward its underlying purpose.

*Co Petro*, 680 F.2d at 581. The Ninth Circuit Court then held that, due to their speculative nature, the contracts at issue were "contracts for sale of a commodity for future delivery." In a recent policy

---

**36.** Nor will finding the 15–day Brent transactions to constitute futures contracts effectively eliminate the CEA's forward contract exception. The intentions of the parties still govern and the opportunity to satisfy a contract through means other than delivery is alone insufficient to categorize the nature of the transaction.

statement, the Commodity Futures Trading Commission affirmed and amplified *Co Petro's* holding by declaring,

> In determining whether a transaction constitutes a futures contract, the Commission and the courts have assessed the transaction "as a whole with a critical eye toward its underlying purpose" [citing *Co Petro*]. Such an assessment entails a review of the "overall effect" of the transaction as well as a determination as to "what the parties intended." Although there is no definitive list of the elements of futures contracts, the CFTC and the courts recognize certain elements as common to such contracts. Futures contracts are contracts for the purchase or sale of a commodity for delivery in the future at a price that is established when the contract is initiated, with both parties to the transaction obligated to fulfill the contract at the specified price. In addition, futures contracts are undertaken principally to assume or shift price risk without transferring the underlying commodity. As a result, futures contracts providing for delivery may be satisfied either by delivery or offset. The Commission has explained that this does not mean that all commodity futures contracts must have these elements [citation omitted]. To hold otherwise would permit ready evasion of the CEA.

Policy Statement Concerning Swap Transactions, *supra*, at 30694–95.[37] Therefore, there is no exhaustive check-list by which a contract can be measured. Addressing the essentials of the futures contract, the Court is convinced that the 15–day Brent transactions satisfy the criteria.

Transnor's contracts for 15–day Brent, a commodity within the CEA's meaning, were dated December 1985 and called for March 1986 delivery, indicating that sales of 15–day Brent could occur several months ahead of the specified loading month. Transnor's Brent contracts established a price for a standardized volume when the contract was initiated in December 1985, despite the ± 5% volume tolerance, and both parties to the contracts were obligated to fulfill the contract at the specified price. Most importantly, the Brent contracts were undertaken mainly to assume or shift price risk without transferring the underlying commodity. Defendants acknowledge that the volume of Brent contract trading greatly exceeded the amount of physical oil available to satisfy such contracts. The volume of contracts traded and the high standardization of the contracts demonstrate the essential investment character of the 15–day Brent market. "With an eye toward [their] underlying purpose," the Court concludes that Transnor's 15–day Brent transactions constitute futures contracts.

## SUFFICIENCY OF TRANSNOR'S CLAIM UNDER THE CEA

■ Defendants next argue that Transnor cannot state a claim under the anti-manipulation provisions of the CEA §§ 9(b) and 4(c) which require proof of each of the following four elements: (1) manipulative conduct; (2) a specific intent to create an artificial price which is not determined by the forces of supply and demand; (3) a causal relationship between the manipulative conduct and a change in market prices; and (4) an artificial price. *Cargill, Inc. v. Hardin,* 452 F.2d 1154, 1162–63 (8th Cir.1971), *cert. denied,* 406 U.S. 932, 92 S.Ct. 1770, 32 L.Ed.2d 135 (1972); *In re Cox,* [1986–87 Transfer Binder] Comm.Fut. L.Rep. (CCH) ¶ 23,786, at 34,061 (CFTC July 15, 1987); T. Russo, *Regulation of the Commodity Futures and Options Markets,* § 12.11 at 12–18 (1983). Because Transnor has raised issues of material fact, not properly decided on this motion, summary judgment is denied.

### Manipulative Conduct

■ Transnor's central allegation concerning manipulative conduct is that de-

---

**37.** The Commission outlines additional elements characteristic of exchange-traded futures contracts, the "presence or absence [of which] is not dispositive of whether a transaction is a futures contract." Policy Statement Concerning Swap Transactions, *supra,* at 30694–95. Accordingly, defendants' claim that the absence of certain of these elements dooms Transnor's off-exchange contracts is spurious at best.

fendants' tax-spinning transactions constituted prohibited "wash sales" entered into for the purpose of artificially depressing the price of oil. Wash trading, not defined in the Act itself, is the practice of entering into or purporting to enter into transactions for the purpose of giving the appearance that trades are being or have been made but without having actually taken a market position. *See* 80 Cong.Rec. 7858 (May 25, 1936); *accord* Admin.D. 200 (May 25, 1966). The existence of a wash result—the purchase and sale of the same futures contract at a similar price—is an insufficient showing to establish a wash sale in violation of § 4c(a) of the CEA. *See In re Collins,* ("Collins III") [1986–87 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 23,401 at 33,077 (CFTC Nov. 26, 1986). Prohibited wash sales are proved only if it is demonstrated that the trader "knowingly participated in transactions initiated with intent to avoid a *bona fide* market position." *Id.; Stoller v. Commodity Futures Trading Comm.,* 834 F.2d 262, 265 (2d Cir.1987); *In re Goldwurm,* 7 Agric.Dec. 265, 274 (1948) ("The essential and identifying characteristic of a 'wash sale' seems to be the intent not to make a genuine, bona fide trading transaction ..."). In *Stoller,* the Second Circuit Court acknowledged that prior rulings on wash sales had concerned transactions that were "virtually riskfree, often prearranged, and intentionally designed to mislead, or to serve other illicit purposes." *Stoller,* 834 F.2d at 266 (citations omitted). Whether a transaction constitutes a wash sale "inevitably turn[s] on the particular facts and circumstances of individual cases and not on any absolute formula." *Collins III,* at 33,077.

Defendants argue that because the 15–day Brent Market involves binding commitments to take or make delivery of physical oil, the fact that a tax spin leaves a company in a net unchanged position as to price spreads does not mean that it has avoided a *bona fide* market position. Defendants claim that, to the contrary, a company completing a spin has assumed the risks of

non-performance by its seller and buyer as well as the credit risks of both counterparties, unlike an offsetting transaction on a exchange-traded futures market where participants look directly to the central clearing house for performance of contractual obligations. Defendants claim that these non-market risks distinguish this case from *In re Goldwurm,* 7 Agric.Dec. 265 (1948), and *In re Siegel Trading Co.,* [1977–80 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 20,452 at 21,827 (CFTC July 26, 1977), which ruled that trades intended as tax avoidance mechanisms are "artificial as far as futures trading is concerned.... [and] fictitious from the standpoint of reality and substance." *In re Siegel,* at 21,844. Transnor maintains that it is market risk, not credit or performance risk, that makes commodities transactions *"bona fide* market positions," citing *In re Gimbel,* [1988] Comm.Fut.L.Rep. (CCH) ¶ 24,213; 1988 CFTC LEXIS 204 (CFTC April 14, 1988), *aff'd,* 872 F.2d 196 (7th Cir.1989), and *Campbell v. Shearson American Express, Inc.,* [1985–86 Transfer Binder] Fed.Sec.L. Rep. (CCH) ¶ 92,303 at 92,047, 92,050 n. 5 (E.D.Mich. Aug. 9, 1985), *aff'd,* 829 F.2d 38 (6th Cir.1987).[38]

While *In re Gimbel,* 1988 CFTC LEXIS 204, at 4, n. 7, states that "[t]o be ficticious within the meaning of Section 4c(a)(A), ... it is sufficient if the transaction is structured to negate price competition or market risk," the Commission did not consider credit or performance risk because the clearing house guaranteed the contractual obligations. Neither the Commission nor any court has considered risks other than price competition or market risk in determining whether a party "negated risk" because hybrid transactions such as those at bar have not until now been deemed futures contracts. Nonetheless, the purpose of the prohibition, to prevent cheating and fraudulent practices "employed to give a false appearance of trading and to cause prices to be registered which are not true prices," 80 Cong.Rec. 7858 (May 25, 1936

---

**38.** *Campbell's* footnote does nothing more than explain the distinction between two risks in a

completely unrelated 10(b)(5) securities claim.

(comments of bill's sponsor, Senator Pope), is served by prohibiting transactions that negate market risk.[39] As stated by the Commission in *In re Collins,* ("Collins II") [1986–87 Transfer Binder] Comm.Fut.L. Rep. (CCH) ¶ 22,982 at 31,896 (CFTC April 4, 1986), "the common denominator of the specific abuses in Section 4c(a)—[including] wash sales ... —and the central characteristic of the general category of fictitious sales, is the use of trading techniques that give the appearance of submitting trades to the open market while negating the risk or price competition incident to such a market."

Transnor asserts that defendants' 16 circular transactions in which the identical amount, grade and delivery date of the oil was traded among the defendants and Mobil on the same day at the same price, as well as defendants' 328 buy/sell transactions with one other party, at identical prices during an erratic Brent Market period, negated market risk. Because defendants do not dispute that these transactions left the companies "in a net unchanged position as to price spreads," this Court concludes that defendants' tax spins feigned a non-existent market position and potentially misled other Brent Market traders, despite any nonmarket risks incurred. To hold otherwise would defeat the purpose of the CEA's clear prohibition.[40]

*Specific Intent*

Defendants next claim that Transnor cannot establish the required intention to induce an artificial price because the trans-actions were entered into for legitimate commercial or investment purposes, citing *In re Indiana Farm Bureau Coop. Ass'n,* [1982–84 Transfer Binder] Comm.Fut.L. Rep. (CCH) ¶ 21,796 at 27,279 (CFTC Dec. 17, 1982). *See* Russo, *supra* at § 12.19. Defendants maintain that tax-spinning transactions were routine commercial transactions entered into for permissible purposes, including tax certainty. Transnor first refutes the relevance of any legitimate purpose to a determination of manipulation and alternatively asserts that defendants' activities, constituting tax fraud, further evidence wash sales.[41]

Where a trader acts with a legitimate investment or commercial purpose, no manipulative intent can be found. *Stoller,* 834 F.2d at 266 (citing with approval the distinction between legitimate market purpose and manipulative intent drawn in *In re Collins,* ("Collins I") [1977–80 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 20,908 at 23,687 (CFTC Aug. 16, 1979); Russo, *supra* § 12.19 at 12–34. The "legitimate market purpose" test for conduct alleged to constitute wash sales is intended to avoid charging a knowing violation and causing undue prejudice to a litigant who may have relied on an agency's prior interpretation or policy. *See Stoller,* at 265–266. A second purpose of the test recognizes that a trader is entitled to act in his best interest so long as he does not act with manipulative intent. *See In re Indiana Bureau Coop. Ass'n.,* [1982–84

---

**39.** Moreover, section 4c(a)(A)'s broad prohibition of any transaction "... of the character of, or commonly known to the trade as, a 'wash sale,'" suggests that negating market risk sufficiently eliminates any significant risk to fall within the prohibition.

**40.** Transnor also claims that defendants paired buy/sell transactions were prearranged. While prearrangement is not a necessary element for finding a wash sale violation, it is one method used to avoid a *bona fide* market position. *See Collins II,* at 31,897. Because it is improbable that a pattern of matched orders or wash results represents the true interplay of market forces, the existence of such a pattern may "raise an inference that the results were intentionally achieved by means of prearrangement." *Id.* Defendants' matched transactions during the relevant period raise an inference of prearrangement, negating price competition, and would be grounds for denial of summary judgment even if the transactions were not deemed wash sales.

Transnor also argues that defendants engaged in manipulative conduct by trading at artificially low prices. This contention, analyzed earlier in connection with Transnor's antitrust claims, need not be further discussed here.

**41.** This Court rejects Transnor's proposition that *Stoller* recognizes that an illicit purpose indicates the existence of a wash sale. A clear reading reveals that the Second Circuit Court merely stated that wash sales had in the past been found in transactions motivated by illicit purposes, not that illegal motives mandate a finding of wash sales.

Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 21,767 at 27,279 (CFTC Dec. 17, 1982).[42]

In *Stoller*, the court reversed the Commission's ruling of liability because, in its view, the public was not apprised that the Commission considered the practice of "roll forward" trading to be encompassed within the wash-sale prohibition of the Act. The Second Circuit Court accepted defendant's claim that the transactions at issue were *"designed to fulfill a purpose generally considered legitimate in the industry"* and declined to hold the public accountable under the Commission's construction of the statute without appropriate notice. *Stoller*, 834 F.2d at 266–67 (emphasis added).[43]

In the case at bar, the alleged legitimate market purpose is tax certainty. However, it is obvious that the incentive behind tax spinning was the achievement not merely of a more certain tax but of a lower tax. Defendants claim that OTO's subsequent sanction of the transactions as legitimate distinguish their activities from the proscribed tax structurings in *Goldwurm* and *In re Siegel*. Transnor maintains that the *Goldwurm* and *In re Siegel* rulings fairly apprised defendants that achieving tax advantages by engaging in offsetting transactions at artificial prices is within the prohibition of "wash sales" and, moreover, that at the time of the tax spins, defendants did not act to "fulfill a purpose generally considered legitimate in the industry," making irrelevant that the U.K. subsequently condoned their conduct.[44]

▮ Clearly, *Goldwurm* and *In re Siegel* gave public notice that illicit tax maneuverings are prohibited under the Act. The more difficult question is whether the

U.K.'s subsequent approval of the transactions retroactively renders the purpose of the transactions legitimate. This Court believes that it does not. More appropriate to a determination of legitimate market purpose than subsequently adjudicated legality is whether the transaction was "designed to fulfill a purpose generally considered legitimate in the industry." *Stoller*, 834 F.2d at 266. Although defendants offer testimony that U.K. tax law as it existed prior to March 1987 permitted integrated oil companies to sell and buy back future cargoes to establish the lowest price for tax purposes, Transnor has refuted that "portfolio pricing" in particular was generally considered legitimate in the industry, citing the deposition testimony of Exxon chief-of-trading Morey Lorenz, Exxon trader Diane Sharp, Conoco trader Player Edwards, Morgan Stanley trader Nancy Kropp, and defendants' expert witness Donald Miller. Transnor also offers the testimony of its U.K. tax expert James Bentley that defendants trading constituted attempted tax fraud. Because there remains a question of material fact as to whether defendants' transacted with a legitimate market purpose in mind, summary judgment is denied.

## Causal Relationship

▮ Defendants assert that the tax spinning transactions were not responsible for the decline in oil prices thereby defeating Transnor's manipulation claim for lack of causation. Defendants submit testimony that the drop in oil prices resulted from the actions of OPEC, particularly its decision to compete for market share. However, where "multiple causes of an artifi-

---

**42.** The Court rejects Transnor's argument that *In re Gimbel*, ¶ 24,313 at 35,003 n. 5, mandates abandonment of the legitimate market purpose test. That the Commission "remains of the view" that commercial motivations underlying transactions are not relevant, neither binds nor persuades this Court in light of the Second Circuit Court's ruling in *Stoller*, 834 F.2d at 266, which is also cited in the footnote. *Stoller* recognized that the statutory language permits the Commission to define its meaning although it may hold the public accountable only upon proper notification.

**43.** *Stoller* overrules a prior CFTC ruling, *Collins II*, at 31,896, that there is "no basis in the statutory language of Section 4c(a) or the legislative history to imply an exception so that otherwise prohibited trading techniques, such as wash sales, would become acceptable when used for an alleged 'legitimate market purpose.'" *See In re Gimbel*, 1988 CFTC LEXIS 204, at 3, n. 6.

**44.** Transnor's argument that OTO would never have accepted defendants' transactions had it been apprised of the true facts is beyond the scope of this inquiry.

cial price ... can be sorted out, and [defendants] are a 'proximate' cause of the artificial price, a charge of manipulation can be sustained." *In re Cox*, at 34,066. As discussed earlier, Transnor presents a question of fact as to causation.

*Artificial Price*

Finally, defendants contend that their conduct did not result in the creation of an artificial price, a requisite to Transnor's CEA manipulation claim. Transnor contends otherwise. This issue of material fact precludes summary judgment.

## CONCLUSION

For the reasons outlined above, defendants' motion for summary judgment is denied.

SO ORDERED.